HAYES et al v. GIBBS et al.

No. 6892. Decided June 4, 1946. (169 P. 2d 781.)

Rehearing Denied December 10, 1946.

See 21 C. J. S., Covenants, sec. 80; 14 Am. Jur. 614. Who may enforce restrictive covenant, etc., notes, 21 A. L. R. 1306, s. 33 A. L. R. 677, 60 A. L. R. 1228, 89 A. L. R. 815; see, also, 14 Am. Jur. 657.

*E. A. Walton,* of Salt Lake City, for appellant.

*Joseph D. Hurd* and *Wallace D. Hurd,* both of Salt Lake City, for respondents.

*E. R. Christensen, H. Holmgren,* and *A. P. Kesler,* all of Salt Lake City, for defendant.

LARSON, Chief Justice.

This is an action to enforce building restrictions. The covenant as set forth in the deeds is as follows:

"No residence shall be erected on any of the said lots costing less than $2500.00 no less than 20 feet from the front line of said lots, *nor shall any building for business purposes be erected on any of said land.* (Italics ours.)

Plaintiff alleges that, in accordance with, and pursuant to, a general plan or scheme of development intended for the benefit of the entire tract known and platted as Douglas Park Subdivision, certain building restrictions were imposed upon the land, a subdivision of lots 1, 2, 3, and 4 of Section 9, Township 1 South, Range 1 East, Salt Lake Base and Meridian, by the original owners and predecessors in interest of both plaintiffs and defendant. He contends that the restrictions were reasonable, and were necessary to the successful development of this subdivision into a high-class residential district. It is averred that the defendant Gibbs has applied for building permits for the erection of mercantile buildings for business purposes upon lots 16, 17, 18, 19 and 20, Block 17, Douglas Park Subdivision, and unless

restrained will proceed with construction thereof, in violation of the restrictions above set out.

Answering, the defendant contends that there was no general plan or scheme in the imposition of the building restrictions such as to justify their existence and maintenance. As to her property, defendant avers that she obtained title thereto through a tax sale, and therefore took the property free and clear of all restrictions.

The title to the specific property in issue, lots 16, 17, 18, 19, 20, Block 17, and lots 27 and 28, Block 14, Douglas Park Subdivision, comes from the Douglas Heights Land and Improvement Company to the Hubbard Investment Company via a conveyance containing restrictive covenants applying to both Hayes and Gibbs. The Hubbard Company conveyed lots 27 and 28 of Block 14 to plaintiffs' predecessors with restrictive building covenants set forth in the deeds. The Hubbard Company conveyed lots 16, 17, 18, 19 and 20 to defendant's predecessors without restrictive covenants in the deed. The record reveals that of the entire Douglas Park subdivision consisting of 1058 lots, only 55, including those now owned by defendant, were conveyed without mention of building restrictions in the deed.

These facts pose two principal issues which will be answered in their listed order:

1. Was there a general plan or scheme which created and imposed equitable building restrictions?

2. Does a tax title extinguish all equitable covenants and restrictions?

*Korn* v. *Campbell,* 192 N. Y. 490, 85 N. E. 687, 689, 37 L. R. A., N. S., 1, 127 Am. St. Rep. 925, is the leading case on restrictive covenants in this country. In that case the court in its discussion of different types of covenants describes the first type as follows:

"* * * In the first class may be placed those which are entered into with the design to carry out a general scheme for the improvement or development of real property. This class embraces all the various plans, generally denominated in the English cases as 'building schemes,' under which an owner of a large plot or tract of land di-

vides it into building lots to be sold to different purchasers for separate occupancy, by deeds which contain uniform covenants restricting the use which the several grantees may make of their premises. In such case the covenant is enforceable by any grantee as against any other, upon the theory that there is a mutuality of covenant and consideration, which binds each, and gives to each the appropriate remedy. Such covenants are entered into by the grantees for their mutual protection and benefit, and the consideration therefor lies in the fact that the diminution in the value of a lot burdened with restrictions is partly or wholly offset by the enhancement in its value due to similar restrictions upon all the other lots in the same tract."

*De Gray* v. *Monmouth Beach Club House Co.*, 50 N. J. Eq. 329, 24 A. 388, 390, further clarifies covenants as follows:

"* * * action is held not to be maintainable between purchasers not parties to the original covenant, in cases in which: (1) It does not appear that the covenant was entered into to carry out some general scheme or plan for the improvement or development of the property which the act of defendant disregards in some particular. * * * (2) It does not appear that the covenant was entered into for the benefit of the land of which complainant has become the owner. * * * (3) It appears that the covenant was not entered into for the benefit of subsequent purchasers, but only for the benefit of the original covantee and his next of kin. * * * (4) It appears that the covenant has not entered into the consideration of the complainant's purchase. * * * (5) It appears that the original plan has been abandoned without dissent, or the character of the neighborhood has so changed as to defeat the purpose of the covenant, and to thus render its enforcement unreasonable."

In *Biltmore Development Co.* v. *Kohn*, 239 Ky. 460, 39 S. W. 2d 687, 689, the court dealt with facts similar to ours in the following manner:

"Where an owner of a tract of land subdivides it into building lots and sells parcels thereof to separate grantees, imposing restrictions in accordance with the general plan or scheme for uniform development, such restrictions inure to the benefit of the several grantees and may be enforced by one of the grantees against any other grantee."

The cases appear to be unanimous in supporting the proposition that if a general scheme for building or develop-

ment is intended by the original grantor, subsequent grantees may bring action against each other to enforce the restrictive covenant. This intent may be gathered from the grantor's acts and attendant circumstances. Constructive or actual notice of the general plan on the part of the grantee is an essential requirement in enforcing the restrictive covenant. See *Vogeler* v. *Alwyn Improvement Corp.*, 247 N. Y. 131, 159 N. E. 886, 887, which held:

"Before a stranger to a conveyance may assert rights based upon a covenant or restriction, 'there must be found somewhere the clear intent to establish the restriction for the benefit of the party suing or his grantor, of which right the defendant must have either actual or constructive notice.' "

After careful consideration of the cases, our conclusion is that if the general plan has been maintained from its inception, if it has been understood, accepted, relied on, and acted upon by all in interest, it is binding and enforceable on all. It goes with the land, and is equally binding on all purchasers with notice.

This being the rule laid down by the cases it poses two questions for our solution: Was a general scheme intended in the present case? If so, did the defendant have actual or constructive notice thereof?

The question of notice can quickly be disposed of for on page 68 of the defendant's abstract of title the restrictive covenant covering 674 lots, including the defendant's, is clearly set out.

In 66 C. J. p. 1128, § 962, we read:

"A purchaser of land is chargeable with notice of all conditions, restrictions, exceptions, or reservations appearing in his chain of title, or concerning which he is put on inquiry. * * *

"Where a purchaser has notice of existence of restrictions because they appear in the direct chain of title, he is chargeable with knowledge of the purpose for which the restrictions were made."

When the title record shows a restriction against erection of houses for a contract price less than a stated sum,

it is sufficient to charge a prospective purchaser ■ with notice of restriction. *Dellaughter* v. *Hargrove,* Tex. Civ. App., 40 S. W. 2d 253.

"A purchaser is not only charged with notice of the contents of deeds of his chain of title but, if the same contain anything that would put a prudent man upon inquiry, he is chargeable with notice of whatever an inquiry would reveal. *Wilkerson* v. *Ward,* Tex. Civ. App., 137 S. W. 158." *Spencer* v. *Maverick,* Tex. Civ. App., 146 S. W. 2d 819, 823.

The restrictions appear in defendant's chain of title— therefore he is chargeable with knowledge of the purpose for which the restrictions were made.

Was a general scheme intended? It is clear that by written restrictions in 95% of the Douglas Company's conveyances, specific contracts, fully understood, accepted, and acted upon by all who purchased, these lots were subjected to a general plan of restriction. There is strong evidence that all of the grantees, including the Hubbard Company, purchased and accepted these lots subject to restrictive convenants which gave rise to conditions that were of a nature to operate as an inducement to purchasers by giving each purchaser the benefit of a general plan. This conclusion is substantiated by the fact that up to the present time both plaintiff and defendant and all others who purchased accepted the restrictions conformed to and relied thereon. This general plan of a strictly residential district, so initiated has never been departed from by any of them. In fact the Hubbard Company, the common grantor of plaintiff and defendant, had printed and circulated a map or plat of the Douglas Park Subdivision on the bottom of which was printed:

"Douglas Park is the cream of the Southeast bench and the most ideal spot in the entire city for a home. This property, for a long time reserved, was finally subdivided and is now building up very rapidly with fine modern homes; over $50,000 worth of residences now under construction. * * * Douglas Park is a high class, restricted residence district, close in, with a magnificent view of the entire city, valley, lake and mountains, and is in the educational center * * *."

In dealing with such inducements to buy the court in the case of *Scheuer* v. *Britt,* 218 Ala. 270, 118 So. 658, 660, held:

"In such cases the equitable right to enforce such mutual covenants is rested on the fact that the building scheme forms and inducement to buy, and becomes a part of the consideration. The buyer submits to a burden upon his lot because of the fact that a like burden is imposed on his neighbor's lot, operating to the benefit of both, and carries a mutual burden resting on the seller and the purchaser."

The result of the grantor's acts is apparent. There is a 95% uniformity of the restriction in all deeds and, a map was circulated which stated that this was a restricted residential district. This coupled with the actual development of the tract free from commercial or business buildings is certainly indicia of a neighborhood plan. From such facts it may be inferred that the grantees were induced to buy and placed reliance on these restrictions.

The defendant contends that this evidence is offset by the fact that 55 of the lots were conveyed by deeds containing no restrictions. Just what percentage of the lots of a tract can be conveyed without restrictions in the deed without destroying a general building plan is not ■ settled. Conceivably, one conveyance free of restrictions could destroy the purpose of a general scheme, and in such a case the pursuance of a general scheme could hardly be said to have been within the intent of the original grantor. On the other hand, particular sections of the subdivision may not fit into the general scheme, and conveyance of such sections free of restriction would not necessarily negative the intent to create a general plan as to the remainder of the lots. Thus *Velie* v. *Richardson,* 126 Minn. 334, 148 N. W. 286, there were 128 lots in a tract. Ninety of these lots were sold with restrictive covenants; two were sold before the owners decided on the form of a building restriction, but with the understanding that the lots were to be used for residential purposes; two were sold without restrictions; and two more with restrictions different from

the rest. The court held that a general building scheme was intended and the fact that a couple of lots were sold without restrictions and two were sold with restrictions differing from the rest did not prove conclusively that a general plan was not intended.

In *Strauss* v. *Ginzberg*, 218 Minn. 57, 15 N. W. 2d 130, 155 A. L. R. 1000, a building restriction was contained in deeds to all of 410 lots except 29½ lots used as follows: two in the extreme northeast quarter of the addition (on which a filling station was later built), four lots occupied by churches, and twenty-three and one-half lots were used as a public school playground. The court upheld the general plan stating that the fact that certain lots were not restricted may even be strong evidence of an intent to create a general plan. In *Leader* v. *LaFlamme*, 111 Me. 242, 88 A. 859, a general scheme was upheld, although two lots did not contain the restrictive covenants; it does not appear how many lots were involved. In *Allen* v. *City of Detroit*, 167 Mich. 464, 133 N. W. 317, at page 319, 36 L. R. A., N. S., 890, five out of eleven lots contained express restrictions but parol evidence was admitted to show that the buyers of the other lots were informed of the restriction and were required to submit building plans before being permitted to buy. The court pointed out:

"That a portion of the conveyances do not contain the restrictions will not defeat the same [right of one party to enforce against another]. Although some of the lots may have written restrictions imposed upon them and others not, if the general plan had been maintained from its inception, if it has been understood, accepted, relied on, and acted upon by all in interest, it is binding and enforceable on all inter se."

The intent of the original grantor is the determining factor. The fact that some of the deeds do not contain restrictive covenants may be evidence of an intent not to establish a building scheme but this evidence is not conclusive. The uniformity of the restrictions, reliance by the buyers, actual development of the tract and

erection of dwelling houses free from business buildings are all considered in determining the existence of the plan.

The Douglas Company divided the subdivision into building lots and conveyed 95% by deeds containing uniform covenants restricting use to residential purposes. It is apparent that there was an intent and design to carry out a general scheme. As for the Hubbard Company, the common grantor of both plaintiff and defendant, the existence of a publicly announced plan of development involving restrictions upon all purchasers, in effect during all the sales by the common grantor, not only reinforces and renders certain the foregoing principles, but also, disposes of the defendant's claim.

2. Does a tax title extinguish all equitable covenants and restrictions?

Although the authorities are not uniform on the subject (see Annotations, 40 A. L. R. 1523, 10 A. L. R. 612) ordinarily a tax sale does not divest easements charged upon the property sold. 3 Cooley, Taxation, 4th Ed., § 1494.

The better considered cases adhere to the theory that the assessment is the basis of the tax title and only that interest which was properly assessed can be sold. *Tintic Undine Mining Co.* v. *Ercanbrack et al.,* 93 Utah 561, 74 P. 2d 1184. If the person assessed as owner had no title to the easement, certainly the tax sale could not pass title thereto; the property assessed and the property conveyed must be the same. If property rights which are not included in an assessment are sold or extinguished by a tax sale, there would be a taking of property without due process of law. The assessors in this State are required to appraise all taxable property "at its full cash value." Sec. 80-5-1, U. C. A. 1943. In determining this value no deduction is made for mortgages, liens, rights of dower, and similar interests. But an easement is not a lien, it is rather a servitude imposed upon the land sometimes said to be "carved out" of the servient estate.

*Jackson* v. *Smith,* 153 App. Div. 724, 138 N. Y. S. 654, 656, describes an easement thus:

"An easement is a servitude upon, and differs from an interest in, or a lien upon, the land. It is not a part of, but is so much carved out of the estate in, the land, and is as much a thing apart from that estate as a parcel of the land itself conveyed from it."

It is a known fact that an easement or restrictive building covenant has a definite effect upon the value of the servient estate and thereby changes the value of the dominant estate. Presumably assessors take into account the effect of easements and covenants on value in ▮ making their appraisals. See *Gowen* v. *Swain,* 90 N. H. 383, 10 A. 2d 249; *Lodge* v. *Swampscott,* 216 Mass. 260, 103 N. E. 635; *Ehren Realty Co.* v. *Magna Charta Building & Loan Ass'n,* 120 N. J. Eq. 136, 184 A. 203. To assess property without regard to a building restriction or an easement would be to assess it without regard to the nature and extent of the property interest which the assessed owner has in the land, in complete disregard of its fair cash value which would be in violation of the statute, Sec. 80-5-1, U. C. A. 1943. It is conceded that assessors cannot be compelled to inquire into all details affecting the title to property, but when their attention is called to matters relating to its value they are bound to pay due regard to them. The assessor should have considered this building restriction when assessing the defendant's property and the fact that one assessor testified he acted in ignorance of the existing restrictive covenant thereby failing to correctly assess the servient estate is of no defense to defendant. The law is not founded on mistakes. It must be conclusively presumed in the assessment of the lots that their value was fixed subject to the covenant. If there was no valid assessment there could be no valid sale and defendant would have no title, and a sale would not extinguish anything.

In the case of *Tax Lien Co.* v. *Schultze,* 213 N. Y. 9, 106 N. E. 751, 752, L. R. A. 1915D, 1115, Ann. Cas. 1916C, 636, it was contended as here, that incumbrances and easements

were effectually cut off by a tax lien foreclosure and sale. That contention was put at rest by the decision of the court which reads as follows:

"The assessment of the lot described in the judgment did not include the easements appurtenant to the adjoining real property. The assessment of the servient estate was subject to the easements included in the assessments of the dominant estate. As a necessary consequence it has been held that, a foreclosure of tax lien and sale of the premises pursuant to sections 1035-1039 of the greater New York Charter [1908], private easements of light, air and access of adjoining owners over the land sold are not extinguished. If property rights, which are excluded from an assessment, are sold or extinguished by a tax sale, there would be a taking of property without due process of law."

See *Poetzsch et al* v. *Mayer,* 115 Misc. 422, 189 N. Y. S. 695, 696, in which the New York Supreme Court held:

"Tax sales and sales in foreclosure of tax liens invest the purchaser with only that title which the owner of the property had; it cannot divest a party situated as the plaintiff is here from a property right such as the easement is here and which was lawfully acquired prior to the levying of the tax under which the sales were made. To hold otherwise would infringe on the plaintiffs' constitutional rights and deprive them of their property rights without due process of law."

*Jackson* v. *Smith,* supra, is an interesting case that has been cited many times with approval. In that case the court held that easements were not extinguished by a tax sale of the burdened premises, notwithstanding such owners were parties to the tax foreclosure suit.

." 'One who purchases land at a tax sale must take all easements and incidents attached or pertaining to the land.' *Smith* v. *Mayor,* 68 N. Y. 552, 557. And it has recently been decided by this court in the Fourth Department that a tax sale of land burdened by easements, lawfully acquired prior to the levying of the tax under which the sale was made does not extinguish the easements. *Blenis* v. *Utica Knitting Co.,* 73 Misc. 61, 130 N. Y. S. 740. * * * If the principle contended for by the respondents is sound, the owner of the dominant estate, who pays the taxes upon a valuation which includes the value of his easements, must also, to protect his easements, pay taxes assessed on another's property, although the value of easements is necessarily excluded from the assessed valuation thereof."

■

The Oregon Court in the case of *Crawford et al.* v. *Senosky et al.*, 128 Or. 229, 274 P. 306, 307, dealt with facts and issues identical with those presented here in the following manner:

"It is unnecessary to determine the precise nature of a tax title. It doubtless is in the nature of a new and independent grant from the sovereign authority (*Hefner* v. *Northwestern Life Ins. Co.*, 123 U. S. 747, 8 S. Ct. 337, 31 L. Ed. 309) ; but the assessment is the basis of it. The property assessed and the property conveyed upon the tax sale must be the same. If the assessment is only of the servient estate, only that can be conveyed on a tax sale; and, vice versa, if the conveyance on the tax sale, or on the foreclosure of a tax lien, is of all the estate or interests in the land, freed from servitude as well as liens thereon, then the assessment must be based upon the land as land, regardless of servitude as well as liens. As has been shown, in making the assessment a deduction must be made for easements, whereas none is made for liens and the like interests."

The New Jersey Court in *Ehren Realty Co.* v. *Magna Charta Building & Loan Ass'n of Newark et al.*, 120 N. J. Eq. 136, 184 A. 203, held:

"Tax sale of servient tenement and foreclosure of certificate of sale does not extinguish right of way appurtenant to adjoining property. * * * When an easement is carved out of one property for the benefit of another, the market value of the servient estate is lessened, and that of the dominant increased, practically by just the value of the easement; the respective tenements should therefore be assessed accordingly."

The above cases definitely state the law. If the assessment is only of the servient estate, only that can be conveyed by a tax sale. See *Tintic Undine Mining Company* v. *Ercanbrack*, supra. The converse of the above cited cases are those cited by the defendant which hold that a private easement is extinguished by a tax sale. *Alamogordo Improvement Co.* v. *Hennessee*, 40 N. M. 162, 56 P. 2d 1127, overruled in *Alamogordo Improvement Co.* v. *Prendergast*, 43 N. M. 245, 91 P. 2d 428, 122 A. L. R. 1277; In re *Hunt and Bell*, 34 Ont. L. R. 256, 263, 24 D. L. R. 590; *Tamblin* v. *Crowley*, 99 Wash. 133, 168 P. 982; *Hanson* v. *Carr*, 66

Wash. 81, 118 P. 927; *Harmon* v. *Gould,* 1 Wash. 2d 1, 94 P. 2d 749. As for *Hanson* v. *Carr* which is relied upon by *Harmon* v. *Gould* and *Tamblin* v. *Crowley,* the decision was based upon a statute which provided that the lien of taxes shall have priority paramount to all other liens or claims; the court stated that when foreclosure of a tax lien is made, and real estate is sold thereunder, the fee passes to the purchaser, and all grants made by the owner of the fee must, of course, fall with the foreclosure. Note the factual distinction from the instant case—the easement in the *Hanson* v. *Carr* case *was granted after the taxes for which the foreclosure was had, had accrued.* In *re Hunt and Bell,* supra, held a sale of land for taxes extinguished a negative easement in the way of a building restriction under a statute making the taxes a special lien on the land in priority to every claim, privilege, lien or encumbrance of every person except the crown. In view of this statute *Re Hunt and Bell* is inapplicable to the decision of this case. The remainder of the cases cited by the defendant are based upon the theory that the power of taxation is an essential and inherent attribute of sovereignty and that the collection of taxes would be seriously hindered, if taxing authorities be required to examine each tract of land for possible easements based upon prescriptive or other claims not of record. We dispute and reject this theory for the following reasons:

1. This restrictive covenant was spread upon the public records.

2. To follow such a theory would create a great insecurity of titles by placing unreasonable burdens upon landowners by putting them in the precarious position of seeing that every one of their 1,058 neighbors are properly assessed and their taxes paid, in order to protect their property from the loss of the restrictive covenant. *Alamogordo Improvement Co.* v. *Prendergast,* supra; *State ex rel Koeln* v. *West Cabanne Imp. Co.,* 278 Mo. 310, 213 S. W. 25; *Schlafly* v. *Baumann,* 341 Mo. 755, 108 S. W. 2d 363, 368.

No paramount right of the state is adversely affected under the facts of this case; and we conclude that the tax

lien and tax title have their foundation upon the assessment. It stands uncontradicted of record that the value of the individual lots within the Douglas subdivision ■ were greatly enhanced in value by reason of said building restrictions. It is common knowledge that real estate values within residential areas are highly sensitive to any removal of restrictions and construction of business buildings; that the sale of lots here involved, 55 in all, free and clear of restrictions so as to allow commercial business buildings to be constructed would have a depreciating effect upon the real estate within the restricted area.

In *Schlafly* v. *Baumann,* supra, the court held:

> "It would be a myopic public and financial policy for the state to blow cold on the value of a lot at the tax sale while blowing hot on its assessed value in arriving at the amount of the delinquent taxes for which the lot is being sold  *  *  *."

We do not believe that the Legislature intended, nor do the holdings of this court lend color to the theory, that tax lien foreclosures and sales should decrease the value of the realty holdings of citizens by destroying re- ■ strictions on the use of real estate mutually bene- ficial to individual citizens in increasing the value of such holdings and the state in increasing its revenue from taxation.

Judgment affirmed. Costs to respondents.

McDONOUGH and WADE, JJ., concur.

WOLFE, Justice.

I concur. I have serious doubts, however, if the real reason why an easement is not extinguished by a *valid* tax procedure is founded on the assessment. It is true that the assessment is the basic step in tax procedure but the really vexatious question in this regard is why valid tax foreclosure proceedings should cleanse the property of "mortgages, liens, rights of dower and similar interests" and not

of easements or building restrictions. We have no trouble respecting mortgage and other liens. They are not interests in land. They are ordinarily contractual rights to resort to land if a debt is not paid. And the reason they are extinguished by valid tax foreclosure sale, at least in this state even though not expressly made inferior by statute to the tax lien, is because of public necessity. *Robinson* v. *Hanson,* 75 Utah 30, 282 P. 782. Tax collecting machinery must be workable. Public necessity so dictates. Very few persons would buy property from the county on tax title if they had to buy it subject to mortgages or other liens for the payment of money. Moreover, a lienholder may protect himself by the payment of the taxes and by adding it to the amount owing from his debtor. Not so with easements or restrictions. But when it comes to "dower and similar interests" we have more difficulty. Dower has been called an interest in land although its enjoyment is contingent, and while contingent has somewhat the nature of a lien—a right to call on the land for a portion contingent on a wife surviving her husband. Certainly a remainder interest after a life tenancy is an interest in land. In some states the tax foreclosure procedure does extinguish dower interests; in others not. Much, of course, depends on the statutes. The matter has given the courts some difficulty. See *Lucas* v. *Purdy,* 142 Iowa 359, 120 N. W. 1063, 24 L. R. A., N. S. 1294, 19 Ann. Cas. 974; *Shell* v. *Duncan,* 1889, 31 S. E. 547, 10 S. E. 330, 5 L. R. A. 821, a well considered case with an illuminating concurring and dissenting opinion. *Blevins et al* v. *Smith,* 1891, 104 Mo. 583, 16 S. W. 213, 13 L. R. A. 441, another case with an informative dissent. What gives me pause in the rationale of the court's opinion in this case is that I cannot see any logical basis for differentiating on the one hand between a dower or a remainder interest in land and on the other hand an easement, except that the land taken in by the county at tax sales would not readily get back on the tax rolls and the tax revenue therefrom actually obtained would be decreased if the land was sold subject to dower rights or remainder rights. That is not

very often the case where an easement is involved. Only in the rare case of a very burdensome easement would it happen. But "dower and similar interests in land" can be considered just as much carved out of land as an easement. Therefore, without being dogmatic or too sure of my ground, I am constrained to place my conclusion on the more fundamental and broader ground of public necessity and workability of the tax laws rather than the nature of the encumbrance, except as that affects the salability of the property.

By this I do not mean to imply that even the public necessity of raising revenue to run the government would permit the sale of property under taxation procedure without due process of law. For the argument I am assuming that due process of law, in methods and procedure has been prescribed by the Legislature and that such have been complied with by those charged with the administration of the tax laws. But apparently the publication of delinquent property by correct description before certificate of sale together with the names of the record owners is notice to the world and therefore notice to all persons having an interest therein and therefore due process. In any event what I say regarding the public necessity of cleansing property of some types of incumbrances and not of others to make it saleable presumes due process.

The opinion says:

"It must be conclusively presumed in the assessment of the lots that their value was fixed subject to the covenant."

It is practically impossible for a county assessor to know of all easements, building restrictions and the like which exist in his county. Indeed in this very case the assessor testified that he acted in ignorance of the building restrictions here involved. Land owners themselves are ofttimes, as in this case, so confused as to the existence of such interests in land that they have to go to the courts to get them settled. The conclusive presumption that the assessor considers the effect of all existing easements and like property

interests when he fixes the value of a particular lot has little basis in fact, and, I think, should not be indulged in. Such a presumption is not necessary for the determination of this case.

As to the proposition that only the servient estate less the burden of the easement is assessed, I call attention to the following passage appearing in Cooley on Taxation, 3d Ed., p. 739; 4th Ed., Sec. 1069, p. 2170, reading:

"In a majority of the states the rule prescribed by the statutes is that lands and other real estate shall be assessed as such, irrespective of the separate estates that individuals may have in them. Under such a practice, he who, for the time being, enjoys the possession of the real estate and the pernancy of the profits may be charged with the tax. The practice, however, has not been universal; in some states, and particularly in some special proceedings, the statutes have required separate interests to be separately assessed. When the whole is assessed as an entirety, provision is usually made under which the respective owners may pay their proportions of the tax, and have their respective interests discharged of the lien."

In case of a life tenant, the rule is generally according to Cooley on Taxation, 3d Ed., p. 723, that he

"should be assessed as owner during the continuance of the life estate."

It would seem that the measure of the tax against the life tenant is the leviable portion of the full value of the land. We do not have a statute requiring the assessor to separate interests.

While I am in agreement therefore with the result that easements and building restrictions are not extinguished by valid tax foreclosure procedure, I am doubtful as to the reason given for that result. In order to assure myself of the correct basis I would be compelled to make an exploration which would consume much effort and time. After all, the holding in this case rather than the ascertainment of the correct reasons for it is of paramount importance. The reason given in the court's opinion may be as sound and rational as any. But the whole field of taxation of real and

personal property is an enormous one with many ramifications. It is ofttimes difficult to make theories accord with the actualities of the taxing process or at least so relate those theories as to present a logical fabric of the law of real estate taxation.

Illustrative of this, I quote from the opinion of Thomas, J., in the case of *Blevins* v. *Smith,* supra, as follows. [104 Mo. 583, 16 S. W. 216]

"We will, in the second place, inquire into the general rule in regard to the sale of land for taxes, and the title acquired by the purchaser at such sale. There are in the several states of this Union two methods of listing lands for taxation,—one is to list the lands 'as the summation of all interests;' and the other is to list the interest of the owners of the land as set out in the assessment roll; and much depends on the method of the assessment as to the interest that passes to the purchaser at a tax-sale. Indeed, when the principles underlying the exercise of the taxing power, and the sale of lands for unpaid taxes, are examined, it will be found that the title conveyed at a tax-sale depends almost wholly on the theory upon which the land is listed and valued for taxation. On this subject Mr. Blackwell, in his work on Tax-Titles (5th Ed., § 954), says: 'When the sale and deed are valid, and have their complete effect, * * * the interest conveyed depends upon the circumstances and the statutes. If a particular interest in the land is separately assessed as such, a sale of that does not pass the whole land, nor will a sale of the land pass such interest. If the land alone is assessed, as the summation of all interests, liens, incumbrances, etc., the general rule is that the deed carries a fee-simple absolute, a new and independent title, the land itself being conveyed; and all prior liens, incumbrances, and interests in, to, or upon the land are extinguished. * * * In those states where the tax is a charge upon the land alone, where no resort, in any event, is contemplated against the owner or his personal estate, and where the proceeding is strictly in rem, the tax-deed will undoubtedly have the effect to destroy all prior interests in the estate, whether vested or contingent, executed or executory, and those in possession, reversion, and remainder. * * * On the other hand, where the law requires the land to be listed in the name of the owner of the fee, or of any other interest in the estate, provides for a personal demand of the tax, and, in case of default, authorizes the seizure of the body or goods of the delinquent in satisfaction of the tax, and in terms, or upon a fair construction of the law, permits a sale of the land only when all other remedies have been exhausted, then the sale and conveyance by the officer pass only the interest of him in whose name it was listed, upon whom the demand

was made, who had notice of the proceedings, and who alone can be regarded as legally delinquent. In such case the title is a derivative one, and the tax purchaser can recover in ejectment only such interest as he may prove to have been vested in the defaulter at the time of the assessment.' As we shall see later on, the method of listing lands for taxation and the sale of them for unpaid taxes in Missouri does not come under either of the categories mentioned by Mr. Blackwell, but partakes of the nature of both somewhat. Mr. Cooley, in his work on Taxation (2d Ed., p. 464), on this same subject says: 'The usual method of enforcing the payment of taxes upon property is by putting the property up at public sale. No one questions the right to do this, and no one doubts that the sale, if fair and made in compliance with the law, and after all preliminary steps have been taken, vests a perfect title in the purchaser to the full extent that the statute has declared.' "

This quotation contains an oft quoted passage from Blackwell's work on Tax Titles. It appears that the interest which passes to the purchaser at the tax sale depends largely on the method of assessment. In view of that quotation from Blackwell, I take it that the correctness of the thesis of the main opinion depends on the assumption that in this state the tax is levied against the owner of the interest rather than as a charge against the land and that the owner's interest alone is assessed and taxed and sold for his tax indebtedness. In such case, says Mr. Blackwell, "the title is a derivative one, and the tax purchaser can recover in ejectment only such interest as he may prove to have been vested in the defaulter at the time of the assessment."

But this court has said in *Welner* v. *Stearns*, 40 Utah 185, 120 P. 490, 493 Ann. Cas. 1914C, 1175,

"Under our statute, as under most of the state statutes of the Union, the tax sale initiates a new title, and has no relation with the previous chain of title", citing Cyc. 1473.

And I think this same statement has been made in several other of our opinions. But if such theory is correct it would seem, according to Blackwell,

"If a particular interest in the land is assessed as such, a sale of that does not pass the whole land, nor will a sale of the land pass such interest. *If the land alone is assessed* as a summation of all interests, liens, incumbrances, etc., the general rule is that the deed carries a fee-simple absolute, a new and independent title, the land itself being conveyed; and all prior liens, incumbrances and interests in, to, or upon the land are extinguished.   *   *   *"

Now we have our court in at least one case founding its conclusion on the proposition that the tax sale initiates a new title from the sovereign and not one that is derivative which would seem to be a proposition that is at variance with the thesis of the main opinion. I am not sure, however, that in the case of *Welner* v. *Stearns,* supra, or any case decided by this court, any real investigation was made as to whether our tax statutes made the tax a charge against the land alone and the proceedings strictly in rem or whether separate interests were assessed and the title received by the tax purchaser therefore derivative or whether our tax statutes present a hybrid system. I can refer to a number of tax sections in our code which seem to make the tax a debt against the individual owning the property and a lien on his property rather than a charge against the property alone.

Our statutes provide (Sec. 80-5-4) that

"The county assessor must, before the 15th day of April of each year, *ascertain the names of all taxable, inhabitants*   *   *   and must assess such [taxable] property to the person by whom it *was owned or claimed*, or *in whose possession* or *control it was*, at 12 o'clock m. of the first day of January next preceding,   *   *   *." (Unless otherwise specified, the italics or emphasis in the quoted parts of the statutes are mine.)

Section 80-5-12 provides that

"*   *   *   the property must be assessed to such name [owner or claimant]"

and Section 80-5-13 requires that

"when a *person is assessed as agent, trustee, bailee, guardian, executor*

*or administrator*, his representative designation must be added to his name, * * *."

Here the express language seems to imply that the assessment is fundamentally against *a person* and not against the property regardless of person.

Likewise, Section 80-5-14, dealing with undistributed or unpartitioned property of deceased persons, may be assessed against their heirs, guardians, executors or administrators or any one of them, *and* the payment of taxes made by either *binds all* of the parties in interest for their proportions. The assessment binds persons not the property except as security for its payment.

Also Section 80-5-18 provides that

"* * * any person claiming the same [lands already described on the assessment book] and desiring to be assessed therefor may have *his name* inserted with that of the person *to whom such land is* assessed."

When we come to Sec. 80-10-1 we find that every tax has the effect of a judgment *against the person* and every lien created by this title

"has the force and effect of an *execution duly levied against all personal property of the delinquent.*"

And Sec. 80-10-3 provides that

"every tax upon real property is a lien against the property assessed; * * * which several liens attach as of the 1st day in January of each year."

Thus by Section 80-10-1 the lien created by Sec. 80-10-3

"has the force and effect of an execution duly levied against all *personal property* of the delinquent."

Certainly this smacks of an assessment against the person rather than a charge against the realty alone—the tax debt being a lien against the realty of the owner.

Section 6090-6092, Complied Laws of Utah 1917, provided for personal suit against a tax debtor for the delinquent tax when there was no sale of the property upon which the tax was a lien when said property was once offered for tax sale. These sections did not survive the 1933 revision of the statutes.

Personal suit for taxes by a county treasurer against a tax debtor who removed from one county to another after being assessed on personal property was authorized by Section 6048, Complied Laws of Utah 1917. This section, likewise, was left out of the 1933 revision of the statutes.

Under our present law, in certain circumstances, personal suit for taxes is authorized against owners or those having care and custody of livestock or honeybees. See Section 80-5-27, U. C. A. 1943.

There are other sections which could be pointed out which support this view. But if this is the theory of our tax code it would seem, according to Blackwell, that the tax is one against the person and the person is assessed and tax titles are derivative and not new titles from the sovereign. And in such case the reasoning of the main opinion would gain support. But until we do determine what the theory of our tax assessment really is, confusion will result. It may be that the tax is one against the person but the procedure to collect it confined to the sale of his property and in that sense a proceeding in rem although Sec. 80-10-3 and some of the other sections would seem to be somewhat against that view.

I have called attention to what appear to me to be inconsistencies in statements in our opinions to point out the danger of seizing on a particular theory to support a current decision without a survey of the whole field. Certainly the habit of seizing on a theory to serve an immediate result, only to find ourselves confronted by a contradictory theory in an earlier or later case when such contradictory theory serves the result in that case, leads to confusion. That is what prompts me to state that I think the pragmatic or functional approach should be used. The two paramount

principles which control in the interpretation of statutory tax law where there is room for statutory construction are workability of tax proceeding and public necessity. These should be recognized as the main guides in interpretation rather than laying down underlying theories to support results which theories appear to be contradictory. Because of public necessity, I agree that mortgages and most other liens, including tax liens and most likely dower and some other interests, are extinguished by *valid* tax foreclosure procedure but not easements.

I call attention, in concluding, to the fact that I have discussed easements in this case because they are analogous to building restrictions but I should add that easements themselves appear to be of two kinds, the negative easement like that for light and air which in effect prohibit the servient tenement owner from building on a part of his land and the affirmative easement which gives the owner of the dominant estate the right to use the other's land in a limited way. At bottom these may be the same because the owner of an easement for light and air may be using it for the transfer of light and air over the other's land instead of for the transfer of himself or his vehicles. But building restrictions appear to be more analogous to the negative than the positive easement. Whatever may be the reasoning which should be employed to support the result in this case, I concur, for correct results have been reached.

PRATT, J., not participating.