CHESAPEAKE ESTATES IMPROVEMENT AS-
SOCIATION, INC. *v.* FOSTER ET UX.

[No. 260, September Term, 1971.]

*Decided March 20, 1972.*

The cause was argued before HAMMOND, C. J., and
BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*L. Robert Evans* with whom was *Walter Litvinuck* on
the brief, for appellant.

Submitted on brief by *Walter W. Claggett* and *Edward
Turner* for appellees.

McWilliams, J., delivered the opinion of the Court.

The chancellor, Clark, J., was called upon to interpret certain restrictive covenants and to consider the validity of the appellant's action in respect thereof. The appellant (Association) says he went too far, but we see it differently. To understand this dispute one first must learn what happened. Our recital of the facts, unless otherwise noted, will be a paraphrase of Judge Clark's findings.

At some time after 1960 a Queen Anne's County farm of 80± acres was subdivided into building lots and christened "Chesapeake Estates." Situated on the west side of Kent Island, just south of Matapeake, it fronts about one-third of a mile on the Chesapeake Bay. The lots are impressed with 16 restrictive covenants. Only four have significance here. They are:

> "1. All lots in Chesapeake Estates shall be for residential use only and not for purposes of any trade or business whatsoever. * * *.
> "2. No residence, dwelling, garage or other structure appurtenant to the residence shall be erected or built on said land, nor shall any addition to or change or alteration therein be made, until the plans and specifications for such structure or alterations and location thereof are submitted to and approved by Guaranteed Realty Corporation, or its successors in the ownership or development of the entire tract, or its duly authorized agents. Written permission must be obtained from Guaranteed Realty Corporation to construct or maintain fences, walls, hedges, buildings, piers, boathouses, bulkheads, bathhouses, and outbuildings."
>
> * * *
>
> "7. No noxious or offensive trade shall be carried on or upon any lot nor shall anything be done or kept thereon which may be or become any annoyance or nuisance to the neighbors.
> "8. No trailer, basement, tent, shack, garage,

barn or other outbuilding erected on the tract shall at any time be used as a residence, temporarily or permanently, nor shall any residence of a temporary character be permitted."

It is agreed that the Association has succeeded to the powers, duties and responsibilities granted to Guaranteed Realty Corporation. In May 1970 the appellees (Foster) became the owners of a lot at the entrance to the development which is subject to the restrictive covenants.

Foster was aware of the covenants. He is a real estate broker who has been active in Queen Anne's County for "quite a number of years." For a like period he has been a dealer in houses manufactured by Gibraltar Industries, Inc. "Gibraltar Homes," as they are called, are built in a Baltimore factory in sections which are transported over the highways to the householder's lot where a foundation has already been constructed. The sections are then fastened together and to the foundation. A well, a septic tank and a drain field are emplaced and connected to the house along with other utilities. The houses meet all of the requirements of the Federal Housing Administration and they are produced in a variety of models and sizes, each variation being named after a Maryland county. Not more than a week is required to assemble a house on its foundation and connect it to the utilities.

In May 1970 Foster submitted to the Association's building committee the plans and specifications for a Gibraltar house, known as the Queen Anne model, which he proposed to place on his lot. It is a one-story rancher 51 feet long and 24 feet wide. It has three bedrooms, a full bathroom, a living room, a dining room and a kitchen. The retail price is about $16,700; the cost of the foundation, the steps, the well, the septic tank and the drain field is extra. Foster told the chairman of the committee that he did not expect to live in the house, and that he intended it to be a sample house, to be used as such only until he could sell it.

The Association's directors met on 10 May 1970. Adopt-

ing the recommendation of its building committee, the directors notified Foster that his application had been denied because his house was not in harmony with the other houses in Chesapeake Estates, all of which, they said, are custom built. Foster sought and obtained a reconsideration. On 17 May the directors again denied his application. Their reasons for doing so, as set forth in the Association's minutes, were:

"1 — Modular homes [1] are brought to the site on trailers in two parts. They are then bolted or otherwise fastened together. Similarly it can later be unfastened and removed to another site if desired by the owner. This gives it the characteristic of a residence of a temporary nature which is not permissible under our association restrictions.

"2 — As above stated the modular home is not intended for use as a residence by Mr. & Mrs. Foster. Rather it is being built for sale. This would be in contravention of our requirement that our properties not be used for any trade or business whatsoever.

"3 — The proposed modular home does not conform to the general characteristics of the other houses in the subdivision, all of which were custom built with attractive individual design features.

"4 — The proposed modular home does not meet the criteria that new homes shall cost above the average of the other homes already in Chesapeake Estates."

On 30 July Foster filed his bill of complaint asking the court "to construe, declare and interpret the legal effect, if any exists, of Restriction No. 2" on his lot and to declare it "to have no effect on any" of the lots in Chesapeake Estates. In its answer the Association stated

---

1. A pretentious and imprecise expression used to describe a house built in sections in a factory.

that the house Foster proposed to erect on his lot "was offensive to the other property owners * * *, [that it] tended to reduce the value of other properties and dwellings in the * * * development, and bore an unfavorable relationship to the other buildings now erected in the * * * development." The case came on for trial before Judge Clark on 1 February 1971 and continued through 2 February.

The tax assessment records for the 23 improved properties in the development were received in evidence. Ten of the 23 front on the Chesapeake Bay and must, therefore, be considered the most valuable locations in the development. The average assessed value of the improvements on these properties is $9,418, said to be 55 percent of the fair market value, indicating an average fair market value of $17,124. There is at least one pre-cut house in the development and at least one "Gibraltar Home" in an adjoining development subject to the same restrictive covenants. The "Gibraltar Home" is in full view of the properties in Chesapeake Estates. A "Gibraltar Home" of comparable size in the nearby Village of Chester is assessed for $9,085 and one in Bay City, also nearby, has an assessed value of $9,435. The houses presently in Chesapeake Estates are one-story structures, "some having chimneys and some having none, some having flat roofs and some having gabled roofs of a rather flat pitch. Some have small porches and others none. Windows are of various patterns; some have shutters and some none." Judge Clark found as a fact that the "Gibraltar Home" compares favorably in appearance, value and size with most of the houses in the development.

Judge Clark thought the Association had failed to prove

> "that a house is any less attractive or valuable because it was factory-built instead of custom-built on the site or that because it was factory-built it must necessarily be considered to be a trailer or temporary structure * * *."

But he held, and we agree, that because Foster intends to use it as a sample house, such a use would contravene the covenant against use for "any trade or business whatsoever." He went on to say:

> "The mere fact that Gibraltar homes are factory-built and portable should not be allowed to stigmatize them as trailers or temporary structures once they have been affixed to their foundations and should not disqualify them for acceptance in Chesapeake Estates as long as they meet the median standards of the other dwellings therein (which we believe the undisputed evidence shows that they do), and are varied in style and location in such a manner that they will not give the development a general appearance of a 'Levittown.' As a matter of fact, since Gibraltar homes are precision built to FHA standards, they could very well be better and more lastingly built than a good many of the custom-built homes in Chesapeake Estates. * * *.

> "In order to prevent Chesapeake Estates from taking on the general appearance of a 'Levittown' through the introduction of Gibraltar homes therein, it must be remembered that the Defendant, through its power to disapprove plans and specifications and enforce compliance with the restrictive covenants running with and binding upon the lots in said development may prevent anyone from erecting the same model of Gibraltar home side by side or within close proximity to each other. Since the obvious intent of the restrictive covenants is to insure that no use or structure will be permitted in the subdivision that would tend to devalue the properties therein, we believe that it would be perfectly reasonable for the Defendant to require that the type of Gibraltar home and the location

thereof be so varied that they would blend in with the general character of the development."

The decree signed and filed by Judge Clark reflects the findings of fact set forth in his opinion. He declared restrictive covenants 1, 2, 8, 13 and 14 to be lawful, valid and binding on all of the lots in the development. He declared Restriction No. 1 to prohibit the building of "speculative and/or sample houses." We shall set forth verbatim paragraphs (c) and (d) of the decree:

"(c) That the action taken by the Board of Directors of the Defendant, Chesapeake Estates Improvement Association, Inc., on May 17, 1970 disapproving the plans and specifications for a Queen Anne model Gibraltar home submitted to it for approval by the Plaintiffs, Carlton L. and Ruth E. Foster, was a legal and valid exercise of their powers and responsibilities under the restrictive covenants, reservations, conditions, etc. in the aforementioned Deed and the Indenture referred to in the Court's Opinion in this case and is therefore hereby affirmed, since it was a necessary step that the Defendant had to take were it to succeed by legal action in preventing the Plaintiffs from building a speculative and/or sample house on Lot 22 in Block A of Chesapeake Estates.

"(d) That Gibraltar homes of the Queen Anne type or better may be built in Chesapeake Estates provided they vary in external appearance and are located in such a manner as not to give the development the general appearance of another 'Levittown' and provided further that they are not built as speculative and/or sample houses but are built only for persons intending to occupy them for residential purposes only who have already purchased the lot upon which they are to be erected."

The Association concedes that its discontent stems ex-

clusively from paragraph (d) of the decree. It professes to have no quarrel with paragraphs (a), (b) and (c), yet it insists here that Judge Clark should have limited his inquiry to the single question whether the Association's directors acted reasonably and in good faith. To go further was error, says the Association. It seems to us, however, that he did not really go any further in paragraph (d) and if, in fact, he did go further, it was certainly not far enough to justify our reversing the decree and, as urged by the Association, "declaring [merely] that the * * * [Association] acted reasonably as a matter of law."

As has been said, the directors gave four reasons for denying Foster's application. Their second reason was that the intended use of the house would violate Restriction No. 1. We think the decree, which in paragraph (b) declares Restriction No. 1 to prohibit the building of "speculative and/or sample houses," also declares, in paragraph (c), that the Association validly denied Foster's application to build a "speculative and/or sample house." There can be little doubt that Judge Clark so restricted the effect of the decree. This becomes clear when we examine what he said in his opinion, and he refers to his opinion in paragraph (c). *See Couser v. State*, 256 Md. 393, 399 (1970); *Stottlemyer v. Kline*, 255 Md. 635, 642 (1969); *Messall v. Merlands Club, Inc.*, 244 Md. 18, 37 (1966). He thought "that because * * * [Foster] intend[s] to use it as a speculative or sample house" that use, "if permitted, would contravene Restrictive Covenant No. 1 * * *." That he was so restricting his ruling became even more clear when he said:

> "Therefore, though we hereby proscribe the Plaintiffs from building a speculative or sample house on Lot 22 in Block A of Chesapeake Estates, we see nothing wrong with their erecting a Gibraltar home of the Queen Anne type or better on said lot, provided they have first sold

the house and lot to a person planning to occupy it as their home and provided further that said house is not used at any time for the purpose of selling other Gibraltar homes."

Even without paragraph (d) the decree, as informed by the opinion, implies both a rejection of the directors' reasons 1, 3 and 4 and a declaration that a Queen Anne model, or better, is not per se violative of the restrictive covenants. Indeed, one could hardly avoid drawing such an inference. But Judge Clark, wisely we think, added paragraph (d) which, again as informed by his opinion, dispels any notion that the lot owner will have carte blanche to emplace on his lot a "Gibraltar home" of whatever configuration might suit his taste but which might devalue the properties of his neighbors. He thought "it would be pretty reasonable for the * * * [Association] to require that the type of Gibraltar home and the location thereof be so varied that they would blend in with the general character of the development." We agree.

No one, having read the transcript of the record, would be able to suppress the notion that the real dragon the Association set out to slay was not Foster but Gibraltar's "modular home" and that it expended virtually all of its ammunition in that direction. Judge Clark was not impressed, which seems to us to be a clear indication that he discovered the ammunition to consist entirely of blank cartridges.

Since we cannot say that Judge Clark's findings of fact are clearly erroneous and since we are not persuaded that he has misapplied the law, we shall affirm the decree. Maryland Rule 886.

*Degree affirmed.*
*Costs to be paid by the appellant.*