# HARBOR VIEW IMPROVEMENT ASSOCIATION, INC. *v.* DOWNEY ET AL.

[No. 88, September Term, 1973.]

*Decided November 28, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*L. Robert Evans*, with whom was *Walter Litvinuck* on the brief, for appellant.

Submitted on brief by *Walter W. Claggett* and *Edward Turner* for appellees.

SMITH, J., delivered the opinion of the Court.

This case no doubt is a direct by-product of the opening in 1952 of the bridge across Chesapeake Bay between Kent Island in Queen Anne's County and Sandy Point in Anne Arundel County.[1] It involves interpretation and application of restrictive covenants.

The plat of the area under consideration filed in this proceeding reveals it to be immediately south of a dual lane highway "leading to Baltimore" and immediately east of Cox's Creek. From this, the trial judge (Wise, J.) correctly concluded that it lies across U. S. Route 50 from a large shopping center.

Appellees, Joseph S. Downey, Jr., *et al.* (Downey), own lots in "Harbor View," a Kent Island development. They sought to erect a duplex home on two of those lots. When permission was refused by appellant, Harbor View Improvement Association, Inc. (Harbor View), a declaratory judgment action was instituted by Downey. The trial judge summarized the facts of this case as follows:

> "The evidence is chiefly documentary and the significant testimony is uncontroverted. The following pertinent facts are determined to have been established thereby. The Complainants as Co-Partners are owners in fee of Lots 10 to 24 of Block P and Lots 1 to 32 of Block Q of 'Harbor View', by conveyance from J. & F., Inc., dated December 23, 1971, and duly recorded . . . , and the Respondent is the successor in interest and authority of the original developer, by conveyance dated September 10, 1964, and duly recorded . . . . Extensive restrictive covenants were placed upon the entire development by conveyance dated

---

1. Kent Island is no metropolitan area, but its population did almost double between 1950 and 1970.

August 12, 1952, and duly recorded .... A plat of the development, including the subject lots, was simultaneously recorded .... The developer subsequently, in accordance with its authority under the covenants and restrictions, executed a certain 'Waiver' of a part of the previous restrictions as to the aforesaid lots on December 12, 1962, and this was duly recorded .... The Complainants propose to erect upon Lots 31 and 32 of Block Q for rental purposes a duplex home, the center line of which would coincide with the dividing line of their lots, which have a total of 27,000 sq. ft. It is estimated to cost $30,000, yield a gross rental of $400 monthly, and have two complete residential units. The proposed design, as illustrated by Plaintiffs' Exhibit #7, would conform to the prevailing architecture of the development, and the perimeter of the building would be well within the setback lines (except of course as to the division line between the lots). Requisite governmental clearance on zoning, sanitation, etc., had been obtained. Respondent's Board of Directors, having been submitted an application containing these recitals and being vested with discretionary authority in such regard by the established restrictive covenants, refused to approve the application, precipitating this litigation."

Restriction No. 1 as later amended and as here applicable, except to the extent modified by the waiver referred to by Judge Wise, reads as follows:

"1. All lots in 'Harborview' shall be for residential use only and not for purposes of any trade or business whatsoever. Structures erected on any one lot shall consist of the main dwelling or residence for the occupancy of one family only, together with a private garage and other structures appurtenant to the main residence, or to be used in

"connection therewith, and on no lot shall there be more than one main dwelling and on no lot shall more than one family occupy the main dwelling or any structure appurtenant thereto. The main dwelling or residence on any lot shall have a set back from the front line of said lot of at least thirty-five (35) feet, and shall have a set back from the dividing lines of said lot of at least ten (10) feet, and shall have a set back from the rear boundary line of the lot of at least ten (10) feet."

Chester Beach, Inc. (Chester Beach) referred to in paragraph 11 of the restrictions as "the developer," reserved "the right in its absolute discretion at any time to annul, waive, change or modify any of the restrictions, conditions, covenants, agreements or provisions contained [t]herein, as to any part of said tract then owned by the developer, and with the consent of the owner as to any other land included in said tract . . . ." Pursuant to that right, on December 12, 1962, an agreement was entered into between Chester Beach and the predecessor in title of Downey. It referred to paragraph 11 of the restrictions, recited the deed from Chester Beach to Downey's predecessor in 1960 and the agreement of those parties at that time "to, simultaneously with the execution of said Deed, waive and change, etc., paragraph 1 of the restrictions contained in the [1952] Deed and Agreement," and said that Chester Beach "in exercise of the aforesaid power of modification, etc., and to confirm the Agreement between [it and the predecessor, did] . . . 'change, modify and annul paragraph 1 from Residential Use, etc. unto Commercial Use, in and to the lots [t]hereinafter described.'" Then, after those "whereas" clauses, it was specified that Chester Beach did "annul, waive and modify paragraph 1 of the aforesaid Deed and Agreement" so that Downey's predecessor would have "full power and authority to use [lots 1 to 32, inclusive, of Block Q and lots 10 to 24, inclusive, of Block P] for commercial purposes."

Counsel for Downey in February, 1972, addressed a letter to Harbor View enclosing "a proposal for the construction of

a duplex dwelling on Lots 31 and 32, Block Q" on behalf of the owners and further stating:

"Included in this proposal are the following documents:

A. One complete set of blue prints for the dwelling.
B. Floor plan layout and picture of front elevation.
C. Copy of portion of subdivision plat showing location of proposed building site.

"The proposed building site is located at the Northeast corner of the intersection of Anchorage Drive and Ellicott Drive and it is approximately 425 feet from the Southerly right-of-way line of U. S. Route 50-301.

"The duplex dwelling will consist of two single family units with each unit having approximately 875 square feet of floor space.

"Each unit will have 2 bedrooms, living room, kitchen and bath, plus storage room and separate entrances. Additionally, each unit will be serviced by its own septic system, electric service and heating service.

"The duplex dwelling will be situated on Lot 31 and 32 so that the center line of the dwelling will be placed on the dividing center line of the two lots. This in essence will mean that each lot will have one single family dwelling unit located on it which will be in accord with the requirement of the Harbor View Subdivision Restriction as they apply to the single family zoned lots.

"Additionally, the dwelling will be situated on the lots so as to conform to or exceed the requirement relating to setbacks of lots in Harbor View.

"The intent of the owners is to construct a dwelling that will be harmonious in design and

appearance to the many other attractive homes in Harbor View and one which will add to the general value of the subdivision.

"The area in which these lots are located is Zoned as an 'R-4' Apartment Zoning District and it would seem that the erection of a dwelling such as this proposed duplex would be far more attractive and in keeping with the general development of Harbor View than would a multi-family apartment structure.

"Your early approval of this proposal will be sincerely appreciated and if you require further information please do not hesitate to contact either myself or the owners."

Something over two months later, Downey was advised that at a meeting of the board of directors of Harbor View it had been "voted to reject [his] duplex apartment bldg. plans on the basis of the Plan Review Committee's report," a copy of that report being enclosed. The reasons given were:

"1. Apartments tend to depreciate the value of other homes.
"2. Having been told by Jos. Downey & Thomas Sullivan there are going to be several, there would be look-alikes.
"3. Setbacks from property lines.
"4. A duplex not compatible with other homes (only temporary residence which does not promote the concern for the development such as a permanent home owner would have).
"5. Sanitation problem (20,000 sq. ft. is necessary requirement—with permission given in certain cases — the amount of duplex's being proposed would create a problem that one home would not.
"6. Speculative bldg."

This action for a declaratory decree then followed. Harbor View was "finally and permanently enjoined from enforcing

or attempting to enforce the aforesaid Paragraph 1 in any manner as to the aforesaid lots" and directed to "forthwith issue its approval of the application [of Downey] or any similar application legally in conformity with the remaining covenants and restrictions."

In deciding this case, we must bear in mind the prior holdings of this Court relative to restrictive covenants. In *Bartell v. Senger*, 160 Md. 685, 693, 155 A. 174 (1931), Judge Offutt said for the Court that "where the language employed to express a restrictive covenant so far involves a doubt as to require construction, the rule is that such covenants are to 'be strictly construed against the person seeking to enforce them,' and that 'all doubts must be resolved in favor of natural rights and a free use of the property.' 18 *C. J.* 387." In *Yorkway Apts. v. Dundalk Co.*, 180 Md. 647, 26 A. 2d 398 (1942), Judge Marbury said for the Court, just before quoting the above language from *Bartell:*

> "The rule of construction with respect to restrictions on land is much more strict than that commonly employed with respect to ordinary contracts. The policy of the law is in favor of the free transfer of land. Restrictions are to be strictly construed against the grantor, and are not to be extended beyond the actual wording of the instrument creating them. The cases are collected and analyzed in one of the recent opinions of this court, delivered in the case of *McKenrick v. Savings Bank*, 174 Md. 118, 197 A. 580. The same rules are re-affirmed in the case of *Whitmarsh v. Richmond*, 179 Md. 523, 20 A. 2d 161." *Id.* at 650.

In *Woodland Beach Ass'n v. Worley*, 253 Md. 442, 449, 252 A. 2d 827 (1969), Judge Barnes quoted with approval for the Court from what Judge Grason said for the Court in *Brady v. Farley*, 193 Md. 255, 66 A. 2d 474 (1949). The statement in *Farley* was:

> "In the recent case of *Norris v. Williams*, 189 Md. 73, 76, 54 A. 2d 331, 332, Judge Delaplaine, speaking for the Court, said:

'However, restrictions upon the use of land are in derogation of the natural right which an owner possesses to use and enjoy his property, and are repugnant to trade and commerce. Consequently, restrictive covenants are construed strictly against their establishment and effect, and liberally in support of the unrestricted use of the land. *Himmel v. Hendler*, 161 Md. 181, 155 A. 316; *Ferguson v. Beth-Mary Steel Corporation*, 166 Md. 666, 172 A. 238; *Baltimore Butchers, Abbatoir & Live Stock Co. v. Union Rendering Co.*, 179 Md. 117, 17 A. 2d 130; *Yorkway Apartments v. Dundalk Co.*, 180 Md. 647, 26 A. 2d 398; *Matthews v. Kernewood, Inc.*, 184 Md. 297, 305, 40 A. 2d 522; *Scholtes v. McColgan*, 184 Md. 480, 490, 41 A. 2d 479.'

"In the case of *Scholtes v. McColgan*, 184 Md. 480, 41 A. 2d 479, 484, the Court said:

'There must be borne in mind the often repeated doctrine that doubts should be resolved in favor of the unrestricted use of property.' "

*Id.* at 258.

To the same effect *see Blitz v. Belvedere Home*, 217 Md. 248, 251, 142 A. 2d 826 (1958); *Millison v. Fruchtman*, 214 Md. 515, 518, 136 A. 2d 240 (1957); and *Middleton Realty v. Roland Park*, 197 Md. 87, 93, 78 A. 2d 200 (1951). This is in accordance with the rule elsewhere. *See* 20 Am. Jur. 2d *Covenants, Conditions, etc.* § 187 (1965). In *Carroll County v. Buckworth*, 234 Md. 547, 200 A. 2d 145 (1964), Chief Judge Brune said for the Court:

"Restrictions in similar terms requiring submission and approval of plans have been upheld in *Peabody Heights Co. v. Willson*, 82 Md. 186, 32 A. 386; *Jones v. Northwest Real Estate Co.*, 149 Md. 271, 131 A. 446; and in *Kirkley v. Seipelt*, 212 Md.

127, 128 A. 2d 430. The latter cases show that approval or disapproval must be reasonable and that the power must be exercised in good faith. See also *Sowers v. Church of the Holy Nativity,* 149 Md. 434, 131 A. 785." *Id.* at 553.

*See also Clayten v. Proutt,* 227 Md. 198, 202, 175 A. 2d 757 (1961); 20 Am. Jur. 2d *Covenants, Conditions, etc.* § 183 (1965); and Annot., *Restrictive Covenant — Consent to Build* 40 A.L.R.3d 864 (1971).

In his opinion in this case Judge Wise said, in relevant part:

"Simply put, the original restrictive covenants (see Paragraph 1 thereof) absolutely prohibited anything but single-family residences throughout the development, and the question presented here would not have arisen except for the above-mentioned 'Waiver' (Plaintiffs' Exhibit # 5). This instrument was, to say the least, inartfully drawn and with inordinate naivete purports to 'annul, waive and modify' the aforesaid Paragraph 1 and vest in the owners of Block Q and a large part of Block P 'full power and authority to use' those lots 'for commercial purposes.' Without containing even an implicit reference in this waiver to the remaining restrictive covenancs, [Harbor View] argues that it is too vague to be enforceable. While this principle is unquestionable, it is likewise unquestionable that it is presumed the parties did not intend a futile act and effect will be given to such agreements if their intent and meaning can be ascertained. M.L.E. *Contracts,* § 4. The latter principle appears to be applicable here and I find a logical, understandable and specific intent and meaning to be manifest in the waiver. In addition to the documentary evidence in the case, judicial notice reveals that the areas covered by the waiver abut on U. S. Route 50, a dual, limited-access highway, and are opposite a thriving shopping

center. It seems quite obvious that the developers recognized the limitation of marketability under the original restrictions and that relaxation of the restrictions would conversely enhance the marketability. Indeed, I believe the fair import of the instrument was to permit much broader usage than would now be permissible, in view of the subsequently imposed zoning controls. A review of the remaining restrictive covenants indicates no great difficulty in dovetailing the waiver and substantial compliance with the original scheme of development as imposed by the remaining restrictions. The necessary corollary is that if it was valid and enforceable when executed it is still viable for all purposes. The broader commercial-use question is not now presented and is not likely to be in view of the since-imposed zoning regulations, permitting only a slightly greater residential density with commercial overtones. In summary, the waiver is specific enough to be enforceable and removes the aforesaid Paragraph 1 from the covenants binding the land of [Downey].

"The disapproval by [Harbor View] of [Downey's] application, in the prescribed exercise of its discretion, must be reviewed for legality under the principles declared in the following language from *Kirkley v. Seipelt*, 212 Md. 127, at p. 133:

'We hold that any refusal to approve the external design or location . . . would have to be based upon a reason that bears some relation to the other buildings or the general plan of development; and this refusal would have to be a reasonable determination made in good faith, and not high-handed, whimsical or captious in manner.'

[Harbor View's] refusal was based upon six specific

reasons, communicated to [Downey] as set forth in Plaintiffs' Exhibit #9 and now considered seriatim.

"(1) 'Apartments tend to depreciate the value of other homes.' It is quite obvious that where a use is permitted, as is found to be the situation here, dislike of that user is not a valid basis for withholding permission.

"(2) 'Having been told . . . there are going to be several, there would be look-alikes.' This point was specifically decided in *Chesapeake Estates v. Foster*, 265 Md. 120, [288 A. 2d 329 (1972),] involving modular homes in an adjacent development. If and when such a stereotype situation confronts [Harbor View] it may validly exercise its discretionary authority, but it may not do so on a prospective hypothesis.

"(3) 'Setbacks from property lines.' This presumably refers to the dual center line of the building and division line of the lots. The short answer here is, and the evidence shows, that these setback lines were never intended or applied to prevent placing a residence in the center of more than one lot — which is precisely the case here — and application of them in that manner is clearly unreasonable and arbitrary.

"(4) 'A duplex not compatible with other homes (only temporary residence which does not promote the concern for the development such as a permanent home owner would have).' The essence of this objection is rental occupancy, which in turn is of the essence of commercial occupancy. As heretofore pointed out, rental occupancy of these lots is permissible and cannot be denied to applicants. It is to be observed in passing that these residences could be separately owned and the evidence shows that some single-family residences in the development are currently rented.

"(5) 'Sanitation problem.' Again, the short

answer is that both sanitary construction and sediment control permits had been obtained from the appropriate governmental authorities (Plaintiffs' Exhibit #10), and this objection is arbitrary.

"(6) 'Speculative building.' [Harbor View's] position seems clearly to be that an income-producing property is necessarily speculative, *i.e.*, that a real estate investment is ipso facto speculative. The fallacy of this position is apparent — it is the original purpose, and not the ultimate result, which determines the character. The fact that Plaintiffs might find it less profitable than they had hoped, and therefore might sell it at a loss, or in a converse situation might sell it at a profit, does not categorize it as a speculation any more than it would the purchase for occupancy of a single-family residence which is later sold, whatever might be the reason.

"Refusal of the application in the circumstances of this case was without legal justification."

Judge Wise correctly applied the law to the facts of this case.

> *Decree affirmed; appellant to pay the costs.*