607 A.2d 82

**Stephen A. MARKEY, III, et al.**

v.

**Morris WOLF, et al.**

No. 1309, Sept. Term, 1991.

Court of Special Appeals of Maryland.

May 28, 1992.

138

Alfred L. Scanlan, Jr. (Stephen A. Markey, III, David R. Sonnenberg and Weinberg and Green, on the brief), Columbia, for appellants.

John F. Simanski, Jr. (Frank, Bernstein, Conaway & Goldman, on the brief), Baltimore, for appellees.

Argued before ALPERT, BLOOM and CATHELL, JJ.

CATHELL, Judge.

This case concerns the creation of a subdivision known as "Bynum Overlook" in Harford County; the imposition of a "Declaration of Covenants, Conditions, Restrictions and Easements" (declaration) for the purpose of "protecting the value and desirability of the Property and the Lots"; and a reservation by the declarant in that declaration of the power to approve building plans.[1] It also involves the effects, on this power of approval, of the grantor's advertising sign stating that the subdivision was one of "exclusive homesites" or signs posted by builder-purchasers of lots in the subdivision advertising "homes from the $160,000's."

Stephen and Tamara Markey and Wilson and Sandy Atkins, appellants, are the only couples involved in this appeal.[2] The suit was originally filed against Morris Wolf, James C. Wolf, and Sharon L. Steinberg, individually and as officers and directors of the Bynum Overlook Homeowners Association, H.M. Land Limited Partnership, M.W.W. Development Company, Terrapin Development, Inc., Leigh

---

1. Included in the various complaints are counts alleging misrepresentation, breach of fiduciary duty and conspiracy.

2. Originally, 12 couples who purchased homes in the Bynum Overlook Development filed suit. Two of the couples requested that they be dismissed as plaintiffs almost immediately after suit was filed. The court granted this request.

Homes, Inc., and Stephen Homes, Incorporated (appellees). H.M. Land Limited Partnership (Developer) is the developer of the Bynum Overlook Subdivision as well as the declarant of the declaration. Its general partners are M.W.W. Development Company and Terrapin Development. Morris Wolf is not only an officer and a director of the Homeowner's Association, he is also president of M.W.W. Development Company. Wolf signed the declaration on behalf of the general partners of the Developer. Leigh Homes, Inc. (Leigh), and Stephen Homes, Incorporated (Stephen) are home builders which purchased lots in the subdivision and subsequently built, or were to build, homes in the subdivision. However, as far as we can discern, neither Leigh nor Stephen constructed any homes belonging to the present appellants. The evidence does not indicate that the Developer was a home builder in the subdivision. Stephen and Leigh have resolved their differences with the appellants and appellants, therefore, have dismissed their appeal as to these parties. Thus, their claims against Stephen and Leigh do not directly concern us.

*Procedural History*

The appellants inform us in their brief that they filed a complaint on April 8, 1991, which alleged that the Developer had violated the restrictive covenants governing the subdivision and had violated its fiduciary duty to the Bynum Overlook Homeowners Association by approving the building of homes substantially smaller and less expensive than pre-existing homes in the subdivision. That original complaint, according to appellants' brief, also alleged that certain builders, including Leigh, misrepresented to prospective purchasers their intentions concerning the size and value of the homes they would build and thus conspired with the Developer to assist it in violating its fiduciary duties to the homeowners.

Thereafter, on May 1, 1991, Stephen filed an Answer and a Motion for Summary Judgment. On May 8, 1991, Morris Wolf, James C. Wolf, and Sharon L. Steinberg (hereinafter

collectively referred to as Wolf) and the developer filed a motion for summary judgment. On May 17, 1991, Leigh filed a motion to dismiss the complaint and motion for summary judgment. By June 3, 1991, the plaintiffs had filed an opposition to each of the motions. On the same day, according to their brief, they filed an "amended complaint."

On June 12, 1991, the trial judge granted Stephen's, Wolf's and the developer's motions for summary judgment. On June 18th, Leigh filed a motion to dismiss the amended complaint. Stephen filed a motion to dismiss the amended complaint on June 20th. Thereafter, on June 24, 1991, the appellants filed a second amended complaint. According to appellants' brief, at a hearing on July 19, 1991, the trial judge again granted summary judgment for Stephen, Wolf and the developer and dismissed the second amended complaint as to them. Finally, on July 31, 1991, the court entered a summary judgment and dismissal of the case against Leigh.[3]

---

**3.** Appellants have not seen fit to include any of the motions for summary judgment or dismissal in the extract. Neither the original nor the first amended complaint have been provided. The only complaint contained in the extract is the second amended complaint, and it is not complete. Pages 7 and 8, and all pages after 9, have been omitted from the extract.

Furthermore, appellants did not choose to incorporate in the extract important portions of the declaration including provisions concerning: voting strength in the association; reservation of the declarant's power to approve building plans (Section 7.1); automatic approval if plans are not acted on within 60 days; the declarant's freedom from liability to any owner as a result of its approval or disapproval of any plan or of its development of any land within the subdivision; amendment or termination of the declaration by an instrument executed by the owners of two-thirds of the lots; and the sole authority of the declarant to exercise the approval powers and the non-assignment of that right (Section 12.5). Appellants also omitted from the extract the reservation in the declaration to declarant of the right to make and adopt reasonable rules and regulations. In fact, appellants included only 3 out of 37 pages of the declaration.

Additionally, appellants did not confer with appellees over extract content as is required by Maryland Rule 8–501. The trial court commented below on the difficulties created by appellants at that level saying that he would "hate to see it go down to the appellate

The trial court's July 31, 1991, memorandum opinion states that the trial court adopted the reasoning set forth in its June 12, 1991, opinion as to all defendants except Leigh. The June 12, 1991, opinion was in reference to the original complaint. It could not have been in reference to the second amended complaint, which had not been filed as of June 12th, and the trial judge could not have relied on the first amended complaint because, as he later stated when he rendered his July 31st opinion, he was unaware that the first amended complaint had been filed. Having been informed by the appellants that the amended complaints added only claims for punitive damages and a prayer for a jury trial, the trial court then rendered a summary judgment for all of the appellees except Leigh for the same reasons given in its June 12th opinion. The July 31st opinion thus applied only to Leigh, except to the extent it adopted the June 12th opinion as to the other appellants.

We note that when appellants' counsel informed the trial court that the function of the amended complaints was to provide for punitive damages and for a jury trial, that was incorrect. There are several important factual modifications that occurred between the original complaint and the second amended complaint.

The original complaint incorrectly alleged that the Association was charged with enforcing the building restrictions contained in the declaration. The second amended complaint correctly alleges that the developer is charged with enforcing those restrictions. Appellants further added in paragraph 14 of the second amended complaint an allegation that in approving the plans of Stephen and Leigh, Wolf and the developer had violated their fiduciary duties to appellants. Additionally, the second amended complaint

---

court and the conclusion is confused and [it is] sent back." By their actions, in not including obviously important parts of the record in the extract, a confusing record reached us. Maryland Rule 8–501(c) mandates that the extract "shall contain all parts of the record ... reasonably necessary for the determination of the questions presented. ..."

includes a provision added to count one—that the developer owed a fiduciary duty to the appellants to exercise architectural control, so as not to injure the value of appellants' property. This provision was conspicuously absent from the original complaint, which based this count solely on an alleged breach of fiduciary duty by the officers and directors of the Homeowner's Association—the alleged duty being to enforce the covenants. Not only were these additions in the second amended complaint absent from the original and first amended complaints, they are conspicuously not included in the version of the second amended complaint found in the extract.

Furthermore, the amended complaint and second amended complaint contain an entirely new count, "Breach of Restrictive Covenant," that was absent from the original complaint. It is also absent from the copy of the second amended complaint contained in the extract. The second amended complaint also added prayers for punitive damages and asked the court to impose a constructive trust on the proceeds of all sales of lots and/or homes where houses of less than 1,800 square feet are built.

It is clear that when the appellants' counsel informed the trial court that the amended complaints concerned punitive damages and jury trial rights, he was not fully or correctly informing the court of the full scope of the amendments. Thus, the reasons given on June 12th by the trial court could not have addressed all of these new matters introduced in the amended complaints as they were not brought to the attention of the court.

The inference we glean from the record is that the court would not have proceeded as it did absent the representations made by appellants' counsel that the amendments concerned only a punitive damage prayer and/or a jury trial request.

In any event, we hold that, because the count for breach of covenant was not before the trial court when he rendered his June 12th opinion and because he merely adopted that

opinion upon the representation of *appellants* that the amendments contained no substantive changes, appellants have failed to preserve for our review any objections they may have as to the effect of the trial court's ruling upon that count.

## *Facts*

Each party furnished a separate statement of facts which differ in certain respects. We shall try to simplify the factual situation by summarizing the statements.[4]

Bynum Overlook is a land subdivision created by the developer. The developer did not construct or build houses in the subdivision. It caused the declaration to be recorded and initially advertised on the property with a sign that the subdivision was one of "Exclusive Homesites." [5] No evidence was presented below that the developer ever defined "Exclusive Homesites" in any manner.

The developer sold several of the lots to builders, including Leigh, Stephen, and others. Rylea Builders, not a party to this suit, subsequently erected a sign or signs on the lots in the subdivision advertising its business. One or more of these signs stated "Single Family Homes from $160,000." Other builders may have attached their sign to either the sign of Rylea Builders or to the developer's sign. That is not clear.

The complaints allege generally that the signs at the entrance to the community and certain statements caused the appellants to believe that this subdivision would be built up with homes costing $160,000 or more. They allege on appeal that one such statement, from a salesman of Rylea, was that the developer had told the salesman that the development would consist of medium to larger scale homes

---

**4.** Where it is apparent that we have in this opinion not noted a fact alleged by one party or the other, it is not an omission, it is a rejection based on lack of support for that allegation of fact in the record.

**5.** Several of the affidavits refer to this sign as saying "Exclusive Homes."

of 2,000 square feet, that several plans for houses less than 1,800 square feet had been rejected, and that Rylea erected its sign that homes were to be priced in the $160,000 range based upon the developer's representations to Rylea.[6]

Another affidavit alleged that Stephen informed the affiant that the reason it was selling lower-priced homes was because Leigh was selling lower priced homes. This affiant stated that Stephen had posted signs first advertising $120,000 homes and had later changed the signs to advertise $100,000 homes. The affiant further stated that those signs were situated where the $160,000 sign of Rylea had been previously. He stated that a representative of Leigh had steered him to Bynum Overlook because it was to be a neighborhood of larger homes. He further stated that, at a Homeowners Association meeting, Morris Wolf informed him that he, Wolf, had 211 votes and therefore refused to commit the Association to take action to require homes to have at least 2,000 square feet. He stated that Morris Wolf then voted his slate to be the Board of Directors and Officers of the Association. He stated that a representative of Leigh Homes stated at a meeting that Leigh's smaller homes were merely enticements and that Leigh was actually converting prospective buyers into larger homes. Other affiants confirmed what the above affiant had stated.

All of the affiants essentially stated that they had been led to believe that the homes were to be valued at $160,000 or more because (1) the developer at one stage erected a sign saying "Exclusive Homesites" (or Exclusive Homes); (2) that thereafter builder-purchasers of the lots erected signs advertising homes from $160,000; and (3) that various

---

6. This statement actually was presented to the trial court after its decision in a later proceeding as to sanctions. It was, in any event, inadmissible. One of the appellants stated that an affidavit containing these factual averments had been drafted for a salesman to sign and that he would have signed it except that his employer, Rylea, had forbidden it. This statement was not presented to the trial court prior to its decision. It was not part of the record before the trial court. Its inclusion in the extract is therefore improper.

representatives of the builder-purchasers told appellants that the homes were to be large, costly, etc. Not one of the plaintiffs below, as far as we can discern from the record, ever had any contact with the developer prior to purchasing in the subdivision; nor did any plaintiff rely on any direct representation of the developer except to the extent that the developer's sign, "Exclusive Homesites" or "Exclusive Homes," might be construed as a representation. We shall further address the facts as necessary within our discussion of the law and the resolution of the issues.

## *Issues*

We rephrase appellants' allegations as follows:

I.      In exercising its right to approve of building plans it was improper under the Declaration for the Declarant to approve of homes of less than 1,800 square feet that cost less than $160,000.

II.     The trial court erred in finding, in respect to the approval of house plans, that Wolf owed no fiduciary duty "to appellants by reason of their positions with the Bynum Overlook Homeowners Association, Inc."

III.    Because there were disputed facts, the trial court erred in granting summary judgment for appellees.

IV.     The trial court's denial of appellants' request for postponement was erroneous.

We rephrase appellees' contentions as follows:

I.      Because covenants restricting the use of land are disfavored and are to be strictly construed, the provisions in the Declaration declaring them to be for the purpose of protecting the value and desirability of the property and reserving to the Declarant the sole right to approve of building plans does not impose an enforceable condition requiring the Declarant to withhold plan approval from proposed plans for homes of less than 1,800 square feet and/or costing less than $160,000.00.

II.   The Developer has breached no contracts with any of the appellants nor has the Developer made any misrepresentations to any of the appellants.

III.   The trial court did not abuse its discretion in deciding to postpone the hearing because the discovery purposes stated in the request for a postponement would not have generated relevance and because of the cloud on title that was created by the appellants' filing of the suit.

## The Law

### I

IN EXERCISING ITS RIGHT TO APPROVE OF BUILDING PLANS, IT WAS PROPER FOR THE DECLARANT TO APPROVE OF HOMES OF LESS THAN 1,800 SQUARE FEET COSTING LESS THAN $160,000.

The trial court in its judgment below found no impropriety. We concur and shall explain. We shall in that explanation furnish a historical perspective of the cases recognizing the right to create restrictions; the manner in which restrictive covenants were, and have come to be construed; and the effect of the reservation of powers when such covenants are created.

#### A.  Historical Perspective

The validity of properly created restrictive covenants is well established in Maryland. In *Jones v. Northwest Real Estate Co.*, 149 Md. 271, 280–81, 131 A. 446 (1925), the Court of Appeals stated:

> [W]e are here dealing with an original grantor, who still owns a considerable part of the land, and the assignees of an original purchaser, and, as the deed specifically states that the covenants are to bind "the grantees their heirs and assigns," there would seem to be no question, under the authorities, of the grantor's right to enforce the covenants.... [Citations omitted.]

It was stated:

> [O]ne owning a tract of land ... may validly impose upon the part granted restrictions upon the use thereof for the

benefit of the part retained, and upon the part retained for the benefit of the part granted, or upon both for the benefit of both; that, where the covenants ... are not expressly for or on behalf of the grantor, his heirs and assigns, they are personal and will not run with the land, but that, if in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity....

*McKenrick v. Sav. Bank of Baltimore*, 174 Md. 118, 128, 197 A. 580 (1938). *See also Gnau v. Kinlein*, 217 Md. 43, 48-49, 141 A.2d 492 (1958); *Turner v. Brocato*, 206 Md. 336, 352, 111 A.2d 855 (1955); *Middleton Realty Co. v. Rolan Park Civic League, Inc.*, 197 Md. 87, 97, 78 A.2d 200 (1951); *Oak Lane Corp. v. Duke*, 196 Md. 136, 139, 75 A.2d 80 (1950); *Levy v. Dundalk Co.*, 177 Md. 636, 647, 11 A.2d 476 (1940). For a more complete review of the Maryland law with respect to covenants and uniform plans of development, see *Steuart Transp. Co. v. Ashe*, 269 Md. 74, 304 A.2d 788 (1973), and cases therein cited.

▮ It is clear that the declaration in the case at bar was designed in furtherance of a general plan of development. The declaration expressly states that it is to benefit the property (Bynum Overlook) and the prospective owners of the lots. We hold that these covenants can, therefore, be enforced by the developer and/or the lot owners. It is, therefore, necessary to construe the meaning of the pertinent provisions of the covenants in order to determine: (1) what, if any, conditions exist affecting the declarant's reservation of plan approval; and (2) whether the facts contained in the respective affidavits of appellants are sufficient to foreclose summary judgment.

### B. Construction of Restrictive Covenants

▮ As we have said, the imposition of restrictive covenants is almost universally recognized. A more difficult problem is the interpretation of such covenants. From the

very early days of subdivision development, the cases have been concerned primarily with the adoption and applicability of rules of construction. Generally, covenants have been construed narrowly and strictly though in more recent years a "reasonableness rule" (termed a modern rule in some foreign jurisdictions) has been engrafted upon the general rule. We explain the metamorphosis as it occurred in Maryland and other jurisdictions.

The early case of *Peabody Heights Co. v. Willson,* 82 Md. 186, 32 A. 1077 (1895), involved certain restrictions. The Court in *Willson* framed the question there presented as whether the restrictions requiring "(1) buildings to be speedily built and (2) building plans to be approved by the directors, were restrictions for the benefit of the grantors or of the grantees." *Id.* at 202, 32 A. 1077. The Court held that the purpose of the restrictions were:

> [T]o make the property in every way attractive and desirable for suburban and city homes, and the covenants and agreements were made in furtherance of this general plan or scheme. They required all plans or designs for buildings should be submitted to the directors for their approval. . . . The object of these restrictions was to prevent the erection of buildings of any kind that might diminish the value of the property or injuriously affect it as a location for better class of dwelling houses.

*Id.* at 200, 32 A. 1077.

The Court also held that the restrictions on plan approval, as well as other restrictions, were for "the common advantage of all persons who might become lessees or grantees of the company. . . . all '. . . parties so coming in with notice. . . .' [are] bound by the terms of covenants. . . ." *Id.* at 201, 32 A. 1077 (citations omitted).[7] Nevertheless, the

---

**7.** The Court held, however, that the provisions that buildings be speedily built was only for the benefit of the developer and his predecessor and thus only the developer had an interest in that restriction and it could extend the time for building, free of any right on the part of vendees of other lots to require that buildings be "speedily" built. 82 Md. at 202, 32 A. 1077.

Court, in discussing what would occur if destroyed houses were rebuilt with differences from the originally approved plans or original houses were built with minor divergences from approved plans, stated the general rule:

> [A]lthough one in conveying real estate may impose certain restrictions ... Courts will always favor a liberal interpretation ... in order to impose as few difficulties as possible in the free use and disposal of the particular estate conveyed.... [I]f the words are doubtful, they will be resolved in favor of keeping the restriction within the narrowest limits. In other words, if there be doubt as to the intention of the parties, Courts will naturally lean in favor of freedom of the property.

*Id.* at 203, 32 A. 1077.

*See also Belleview Constr. Co. v. Rugby Hall Community Assoc., Inc.,* 321 Md. 152, 158, 582 A.2d 493 (1990); *Woodland Beach Property Owners' Ass'n, Inc. v. Worley,* 253 Md. 442, 450, 252 A.2d 827 (1969); *Blitz v. Belvedere Convalescent and Nursing Home, Inc.,* 217 Md. 248, 251, 142 A.2d 826 (1958); *Wells v. Osborne,* 204 Md. 375, 377–79, 104 A.2d 599 (1954) (*Osborne II*); *Trunck v. Hack's Point Community Assoc.,* 204 Md. 193, 196–97, 103 A.2d 343 (1954); *Sorensen v. J.H. Lawrence Co.,* 197 Md. 331, 337, 79 A.2d 382 (1951) (applying the rules of construction of restrictive covenants to party wall agreements); *Osborne v. Talbot,* 197 Md. 105, 116–17, 78 A.2d 205 (1951) (*Osborne I*); *Middleton Realty Co.,* 197 Md. at 93, 78 A.2d 200; *Brady v. Farley,* 193 Md. 255, 258, 66 A.2d 474 (1949); *Norris v. Williams,* 189 Md. 73, 76, 54 A.2d 331 (1947); *Whitmarsh v. Richmond,* 179 Md. 523, 527, 20 A.2d 161 (1941); *Ferguson v. Beth–Mary Steel Corp.,* 166 Md. 666, 672, 172 A. 238 (1934); *Himmel v. Hendler,* 161 Md. 181, 187, 155 A. 316 (1931); *Bartell v. Senger,* 160 Md. 685, 693, 155 A. 174 (1931); *Guilford Association, Inc. v. Beasley,* 29 Md.App. 694, 699, 350 A.2d 169, *cert. denied,* 277 Md. 735 (1976) ("If the clarity of the restrictive covenant is dubious, the courts will hold the restriction to its narrowest limits. Put another way, if there is doubt as to the meaning of the restriction,

the courts will generally rule in favor of the freedom of the property from the strictures of the restriction.") (Citations omitted.)

Restrictions requiring the cost of a building not to fall below a certain amount have been upheld under narrow construction. See *Meredith v. Danzer*, 142 Md. 573, 121 A. 245 (1923), where the Court of Appeals while acknowledging the trial judge's "strength of position" and the "force of his logical reasoning," nevertheless reversed his finding that a minimum cost per dwelling required an apartment house to incur a minimum cost per apartment in the building. Relying on the principle that restrictions are not favored, the appellate court held that it was "unable to say that, *beyond a reasonable doubt*,[8] the word 'dwelling' ... was intended to apply to each separate apartment...." *Id.* at 583, 121 A. 245 (Emphasis added.)[9] *See also Smith v. Gov't Realty, Inc.*, 172 Md. 547, 551, 192 A. 341 (1937); *Sowers v. Vestry of the Church of the Holy Nativity*, 149 Md. 434, 442, 131 A. 785 (1926) ("[I]t is not the province of this Court to supply a missing stipulation or a presumed intention ... where the ... deed ... [does] not necessarily cause to arise the implication that the parties ... must have intended that the suggested restrictive covenant ... should exist."); *Saratoga Bldg. and Land Corp. v. Roland Park Apartment Stables Co.*, 146 Md. 152, 158, 128 A. 270 (1924).

In one of the earliest cases in which a "reasonableness rule" appears to have been engrafted on the strict construction rule, the Court stated:

---

**8.** It would appear that in this case the Court in construing restrictions inadvertently adopted a "reasonable standard" when the landowners' actions were approved by the approving authority and a "beyond a reasonable doubt" standard when the landowners' actions were disapproved. In order to establish an interpretation that more severely restricts the free use of land, the evidence under this holding must support that inference "beyond a reasonable doubt."

**9.** *Meredith* was cited as authority for the validity of cost restrictions in *Jones v. Northwest Real Estate Co., supra,* without reference to its reversal of the trial judge's "per apartment" interpretation.

A violation ... occurs only when there is a *plain disregard* of the limitation imposed by its *express* words. So, also, when the words used are as logically susceptible of a construction which would not violate the covenant, as of one which would violate it, the rule is to construe it so as not to constitute a violation.

In interpreting words used to create restrictions, *the court should endeavor to ascertain the real purpose and intention of the parties and to discover the purpose from the surrounding circumstances at the time of the creation of the restriction,* as well as from the words used. In endeavoring to arrive at the intention, the words used should be taken in their ordinary and popular sense, unless it plainly appears from the context that the parties intended to use them in a different sense, *or that they have acquired a peculiar or special meaning in respect to the particular subject-matter.*

*Himmel,* 161 Md. at 187–88, 155 A. 316 (citations omitted, emphasis added). *See Belleview,* 321 Md. at 157–59, 582 A.2d 493; *Harbor View Improvement Ass'n, Inc. v. Downey,* 270 Md. 365, 371, 311 A.2d 422 (1973); *Yorkway Apts., Inc. v. Dundalk Co.,* 180 Md. 647, 650, 26 A.2d 398 (1942); *Whitmarsh,* 179 Md. at 527, 20 A.2d 161; *McKenrick,* 174 Md. at 128, 197 A. 580; *Metius v. Julio,* 27 Md.App. 491, 498, 342 A.2d 348, *cert. denied,* 276 Md. 747 (1975).

The Court of Appeals did not thereafter always recognize the modified standard implied in *Himmel.* In *Baltimore Butchers Abattoir & Live Stock Co. v. Union Rendering Co.,* 179 Md. 117, 123, 17 A.2d 130 (1940), the Court said: "A restrictive covenant should not be extended by implication beyond its original intent to include anything not clearly expressed in the conveyance, and, if there is ambiguity ... any doubt should be resolved in favor of the unrestricted use of property.... The burden rests upon the party relying on a restrictive covenant to bring himself within its terms." (Citations omitted.) *See also Patuxent Dev. Co. v. Ades of Lexington, Inc.,* 257 Md. 398, 405, 263 A.2d 584 (1970); *Adams v. Parater,* 206 Md. 224, 232, 111 A.2d 590

(1955); *Checket–Columbia Co. v. Lipman,* 201 Md. 494, 501, 94 A.2d 433 (1953); *Middleton Realty Co.,* 197 Md. at 93, 78 A.2d 200.

A later case, apparently recognizing the reasonableness modification of the strict construction rule, is the often-cited case of *Turner v. Brocato,* 206 Md. 336, 111 A.2d 855 (1955). In that case, the Court said: "This rule of construction [that doubt must be resolved in favor of the alienability of land] bows always to the more fundamental rule that wherever possible effect will be given to an ascertained intention of the parties." *Id.* at 352, 111 A.2d 855. *Turner* involved a subsequent grantee who received a deed from a common grantor free of restrictions and then attempted to utilize the property contrary to the restrictions contained in prior conveyances to other properties. It also involved a sign posted for 20 years by the developer on the project's land. That sign stated "Poplar Hill—A Restricted Residential Development." All prospective purchasers received contracts of sale which stated that the properties were subject to "Poplar Hill restrictions." Additionally, they all received plats referring to the land being developed into lots not sections. *Id.* at 340–42, 111 A.2d 855. Numerous owners testified that they had bought in reliance on the restrictions, built expensive homes and considered their properties covered by the restrictions. It was established that the restrictions were a selling point and important to the purchasers. The restrictions included certain restraints similar to that being contested in the case *sub judice, i.e.,* set backs, open spaces and plan approval, that were subject to a waiver power reserved to the developer. Other restrictions were not subject to the waiver.

The proposed use of the lot in issue was as a cleaning establishment which was prohibited by the covenants. The Court stated: "[E]quity, under appropriate facts, will enforce what variously has been called reciprocal negative

easements,[10] implied equitable reciprocal servitudes or merely equities attached to land." 206 Md. at 346, 111 A.2d 855. The *Turner* Court held that it was not relying only on the language of the deeds but that: "[A]ll the evidence, including the deeds, [showed] an intent ... to bind all the land in Poplar Hill by restrictions similar to those imposed, in substantial uniformity on each lot sold." *Id.* at 349, 111 A.2d 855. The Court then held that the evidence "shows that all of these tests have been fully met." *Id.* *See also Coomes v. Aero Theatre and Shopping Center, Inc.*, 207 Md. 432, 439, 114 A.2d 631 (1955).

The Court of Appeals appeared to retreat somewhat from the reasonableness rule and its *Turner* holding in the later case of *Club Manor, Inc. v. Oheb Shalom Congregation of Baltimore City*, 211 Md. 465, 128 A.2d 405 (1957), stating that there was no evidence of any plat, recorded or unrecorded, and no showing that any person had bought property believing that any restriction was part of a general plan. That Court, citing several of the pre-*Turner* cases that *Turner* appeared to have distinguished, held that even if the restrictions had been uniformly imposed in all of the deeds it would not have been sufficient. The Court then said: "In other words, the whole question becomes a question of fact, to be determined from all the circumstances in the case. In its consideration, there must be borne in mind the often repeated doctrine that doubts should be resolved

---

10.  Ordinarily, four elements must be established to show a reciprocal negative easement:
>     (1) There must be a common grantor.
>     (2) There must be a designation of the land or tract subject to restrictions.
>     (3) There must be a general plan or scheme of restriction in existence for the designated land or tract.
>     (4) The restrictive covenants must run with the land.
>     \*     \*     \*     \*     \*     \*
>     In determining whether reciprocal negative easements have been created, resort should be had not only to the language of the deeds, but "the circumstances surrounding the origin of covenants should also be considered." [Citations omitted.] *Bomar v. Echols*, 270 S.C. 676, 244 S.E.2d 308, 310 (1978).

in favor of the unrestricted use of property." 211 Md. at 479, 128 A.2d 405 (quoting *Scholtes v. McColgan,* 184 Md. 480, 489–90, 41 A.2d 479 (1945)). *See also Millison v. Fruchtman,* 214 Md. 515, 518, 136 A.2d 240 (1957).

This Court applied the strict construction rule in *Metius v. Julio, supra,* where a restriction limited structures to "three stories in height." We held that if only three stories were to be permitted, then the words "in height" would have been unnecessary. We concluded that the restriction was ambiguous and, affording to the words their ordinary meaning and considering the circumstances extant when the restriction was imposed, held that it limited the building to three stories above grade and because its purpose was to limit height an additional sub-grade floor did not violate the restriction. We said: "An agreement restricting the use of land should be construed so as to avoid a finding of a violation thereof, when the covenant is as logically susceptible of such construction as of one entailing its violation." 27 Md.App. at 499, 342 A.2d 348. (Footnote omitted.)

Subsequent to all of the above cases, and in essence reiterating again its *Turner* holding, the Court of Appeals, though it did not describe it as such, recognized the "modern" or "reasonable" rule once again in its most recent case of *Belleview Construction Co. v. Rugby Hall Community Association,* 321 Md. 152, 582 A.2d 493 (1990). The Court stated that it was a "cardinal principle" that the intentions of the parties appearing from, *or implied by,* the instrument controls when covenants are construed and that that language should be considered along with the objects of the parties and the other "circumstances and conditions affecting the parties and the property." *Id.* at 157, 582 A.2d 493. The Court further said that: "The rule of strict construction should not be employed ... to defeat a restrictive covenant that is clear on its face, *or is clear when considered in light of the surrounding circumstances." Id.* at 158, 582 A.2d 493 (emphasis added).

Foreign jurisdictions are generally in accord with the Maryland cases and have undergone generally a similar

change from pure strict construction to reasonable strict construction. The Kentucky Court of Appeals applied general contract law in resolving some issues involving restrictions in *Parrish v. Newbury*, 279 S.W.2d 229, 233 (Ky.1955), saying:

> [A]s a fundamental and supreme rule of construction of contracts, the intention of the parties governs. That intention in respect to a restrictive covenant is to be gathered from the entire context of the instruments. Often the surrounding circumstances and the object which the covenant was designed to accomplish, which may be revealed in part by a general scheme or plan of development, are important considerations where the meaning is doubtful. [Citations omitted.]

*Accord Owenby v. Boring*, 38 Tenn.App. 540, 276 S.W.2d 757 (1955). See also John T. Bondurant and David E. Arvin, *Survey of Real Property*, 69 Ky.L.J. 625, 646 (1980–81), where the authors stated:

> The modern view is that restrictive covenants are to be regarded more as a protection to the property owner and the public than as an undesirable restraint on the use of the property. Reasonable restrictions ... in unambiguous language will be strictly enforced, but a restrictive meaning will not to be read into ambiguous language. [Footnotes omitted.]

In commenting on *Midway Properties, Inc. v. Pfister*, 292 S.C. 104, 354 S.E.2d 926 (Ct.App.1987),[11] a commentator noted that although South Carolina recognized the strict construction rule, the cases indicate that "this general rule is limited: '[C]ovenants ... should not be construed so as to defeat the plain and obvious purpose of the contractual instrument.'" J. Albert Winkler, *II Liberal Construction of Restrictive Covenant based on Developer's Intent*, 40

---

**11.** *Pfister* also involved a plan approval provision but the issue was whether a TV satellite dish antenna was subject to the plan approval provisions which in addition to buildings and structures extended to "fence[s], wall[s], or barrier[s]."

S.C.L.Rev. 211, 212 n. 46 (1988) (citation omitted). The commentator opined that *Pfister* represented the great extent that South Carolina had gone in order, not to invalidate restrictive covenants, but to uphold them. He stated: "Modern courts ... are turning away from strict construction.... [but] [e]ven under the modern approach ... courts employ strict construction where ambiguous language creates a doubt as to the intentions of the parties." *Id.* at 213–14 (footnotes omitted). *See also* Wayne S. Hyatt, *Condominium and Homeowner Association Practice: Community Association Law* (2d ed. 1988).

### C. Reservations in Declarations

The matter of reserving the right to alter or amend covenants, rules or regulations contained in an instrument creating restrictions has gotten special attention over the years both in Maryland and elsewhere.

In *Schaidt v. Blaul*, 66 Md. 141, 145, 6 A. 669 (1886), the Court was concerned in part with the difference between an exception in a deed and a reservation in a deed:

> A reservation is a clause ... whereby the ... grantor, etc., doth reserve some new thing to himself out of that which he granted before.... [a]n exception which is ever of part of the thing granted....

Quoting *Sheppard's Touchstone*, 80.

In *Matthews v. Kernewood, Inc.*, 184 Md. 297, 299–306, 40 A.2d 522 (1945), land was conveyed to a development corporation under an original intention that the lots would be unusually large. The development corporation (Kernewood) conveyed from the tract certain portions as lots. Kernewood intended to subject the tract to certain restrictions and these restrictions were recited in the deeds and provided for minimum cost of $20,000 for dwellings. The developer reserved the right to annul, waive, change, or modify any of the restrictions. *Id.* at 299, 40 A.2d 522. Thereafter, the developer's successor resubdivided the retained property into smaller parcels and modified the restrictions as to minimum costs. Some of the prior lot

owners instituted suit, alleging in part that the restrictions had created a general plan of a subdivision, that the restrictions contemplated that private dwellings would be spaced at distances greater than that found in ordinary subdivisions, that the original plan had enhanced the value of all the lots in the subdivision, and that they purchased in reliance on the general plan. They further argued that the provisions permitting annulment or modification could not be exercised in such a manner as to destroy or impair the general plan, *i.e.*, structures below certain costs placed closer than usual. *Id.* at 300–02, 40 A.2d 522. The Court held, in part:

Section V of the restrictions gives the right to the company in its absolute discretion ... to annul any of the ... covenants.... The word "annul" is hardly one requiring judicial interpretation. "It is not a technical word and there is nothing which prevents the idea from being expressed in equivalent words." It is clearly understood to mean "revoke" or "abolish." ... One who conveys ... land ... may reserve to himself the power to modify or omit these restrictions altogether.... Even if language ... involves a doubt as to the construction, the rule is that such covenants are to be construed strictly against those seeking to enforce them....

[T]he original plan was a subdivision of large lots with expensive houses and the present change ... permits less expensive properties.... [A]t this time it is difficult to sell large lots which call for the construction of large and expensive houses....

*Id.* at 306–08, 40 A.2d 522. The court affirmed the chancellor's dismissal of the complaint. *See also Plack v. Weber,* 190 Md. 431, 433, 58 A.2d 489 (1948).

The restrictive covenants in *Bride v. Finegan,* 226 Md. 356, 359, 174 A.2d 70 (1961), contained provisions that resubdivision could be made by the original grantors or their designated agents. The original grantors conveyed the retained land to the Finegans along with a designation of the Finegans as agents for the purpose of exercising the

powers under the declaration of covenants. The Finegans proceeded to resubdivide one of the parcels. The Brides and others sued to enforce the covenants. *Id.* at 358, 174 A.2d 70. The Court held:

It is obvious ... that the original subdividers ... intended to reserve the right to modify the covenant....

\* \* \* \* \* \*

The power to consent to resubdivision ... amounts to a reservation of a right to waive these restrictions.... The reservation of such a right to change or waive has been held to negative the intention to create a general neighborhood plan of development. This rule is in accordance with the weight of authority especially where, as in this case, the reserved right of waiver has been previously exercised.

In this case the reservation of the right to consent to the waiver of certain restrictions ... prevents those restrictions which may be waived or modified from being part of a general plan of development. [Citations omitted.]

*Id.* at 359–60, 174 A.2d 70.

In *Kenney v. Morgan,* 22 Md.App. 698, 706–07, 325 A.2d 419 (1974), we held:

The right of a developer of property to retain a power to waive restrictions is clearly recognized in this State. In *Matthews v. Kernewood, Inc.,* 184 Md. 297 [40 A.2d 522], it was said at page 307 [40 A.2d 522]:

One who conveys a part of a tract of land by deed containing restrictive covenants may reserve to himself the power to modify or omit these restrictions altogether as was done in the case at bar.

We further held in *Kenney* that "[t]he right of a developer to reserve a power to approve or disapprove designs for proposed buildings was recognized in the early case of

*Peabody Heights Co. v. Willson,* 82 Md. 186, 203 [32 A. 1077]." [12]   *Id.* at 707, 325 A.2d 419.

Foreign jurisdictions are generally in agreement with the Maryland cases in regards to amendments. In *Davis v. Miller,* 212 Ga. 836, 96 S.E.2d 498 (1957), the court approved the retention by a developer of the right to except lots from restrictive provisions. That court said: "The right to make exceptions being included in the instrument imposing the restrictions in the first instance, and the plaintiffs having purchased with notice of the grantor's right ... they cannot complain when exceptions are made pursuant to powers retained." *Id.* 96 S.E.2d at 502. In *Johnson v. Three Bays Properties # 2, Inc.,* 159 So.2d 924, 925 (Fla.Dist.Ct.App. 1964), the court framed the issue presented by the lot owners as:

> The grantees contend, however, that the right to amend limited appellee to the right to adopt new covenants that were more restrictive but not less restrictive. It is undisputed that the amendment is less restrictive.

It held: "The word modify is commonly understood to mean alteration or change.... [it] may be characterized ... as either an increase or decrease.... [A]ppellee would be entitled to adopt covenants that were either more or less restrictive...." (Footnote omitted.) After so holding, the Florida Court went on rather cryptically to opine that nevertheless "[a]ppellants are entitled to protection against an unreasonable diminution of the building requirements of the subdivision...." *Id.* at 926. See also *Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.,* 303 So.2d 665 (Fla.Dist.Ct.App.1974), where the court commented on the inherent inconsistency of adopting restrictions to govern community development that reserve to the developer the right to alter or terminate them. That Court

---

**12.** *Peabody Heights, Matthews* and *Plack* were all decided prior to *Turner* which seemed to recognize a reasonableness rule. These cases, as well as *Kenney* and *Bride,* were decided prior to *Belleview Construction* which, though not expressing it in explicit terms, appears to have adopted the reasonableness or modern rule.

reconciled the inconsistency by "reading into the reservation clause a requirement of reasonableness...." [13]  *Id.* at 666.  *And see Carrigan & Boland, Inc. v. Worrock,* 402 So.2d 514, 517 (Fla.Dist.Ct.App.1981);  *Golian v. Polhironakis,* 390 So.2d 187, 188 (Fla.Dist.Ct.App.1980);  *Loch Haven Homeowners' Ass'n, Inc. v. Nelle,* 389 So.2d 697, 698–99 (Fla.Dist.Ct.App.1980), *aff'd* 413 So.2d 28 (Fla.1982) (adopting "the more modern judicial attitude" that such a reservation is only one of the factors to be considered in resolving whether a grantor intended to create a uniform or common scheme of development);  *Bay Island Towers, Inc. v. Bay Island–Siesta Ass'n,* 316 So.2d 574, 575–76 (Fla.Dist. Ct.App.1975);  *Rodrigue v. LaFlamme,* 122 N.H. 966, 453 A.2d 1254 (1982);  *Lakemoor Community Club, Inc. v. Swanson,* 24 Wash.App. 10, 600 P.2d 1022, 1026 (1979) ("[t]o permit [the developer] to exercise the consent provision ... is to elevate defendants' selfish wishes over the justifiable interests and expectations of the individual lot owner.  Such a result would be both unreasonable and unconscionable.").  And see *Scott v. Sandestin Corp.,* 491 So.2d 334, 335 (Fla.Dist.Ct.App.1986), where a developer had reserved the right to establish the terms and conditions of amenity membership.  The court held that the terms and conditions had to be reasonable and that a requirement of "master association membership" was reasonable.[14]

---

**13.**  As we have said, *supra,* the Maryland courts have at least alluded to the "reasonableness rule" by opining that the strict construction rule does not overcome the "intent of the parties."  *Belleview,* 321 Md. at 157–59, 582 A.2d 493; *Harbor View Improvement Ass'n v. Downey,* 270 Md. 365, 371, 311 A.2d 422 (1973); *Himmel,* 161 Md. 181, 187–88, 155 A. 316 (1931); *Metius,* 27 Md.App. at 498, 342 A.2d 348.

**14.**  This case arose out of the developmental practice in Florida of the developer reserving the amenities (pools, golf course, tennis courts, pavilions, shuffleboard courts, etc.) from the development.  The developer controls the Homeowners' Association causing it to enter into a long term lease from the developer of those amenities at allegedly high rates.  When the homeowners take over the Association, they are bound to the long term leases.  *Scott* involved a variation where several subdivisions were required to be members of a master association and thus required to pay fees for use of amenities under the

Reservations by the grantors or developers of the right to approve of uses or *structures* have been upheld since at least the 1950's in Maryland and in other jurisdictions. In 1957, the Court of Appeals adopted the reasonableness rule with respect to the *disapproval* of plans. *Kirkley v. Seipelt*, 212 Md. 127, 128 A.2d 430 (1957). The restrictions in *Kirkley* provided, in part, for approval of building plans by the developer. The covenant was held to be reasonable even though there were no specific standards nor any general plan or scheme of development to guide the developer in the approval process. The developer withheld approval of certain metal awnings. There was evidence that only two houses out of 1,500 houses in the development had such awnings. The Court stated: "[A]ny refusal to approve ... would have to be based upon a reason that bears some relation to the other buildings or the general plan of development; and this *refusal* would have to be a reasonable determination made in good faith, and not high-handed, whimsical or captious [sic] in manner." *Id.* at 133, 128 A.2d 430 [15] (emphasis added). The *Kirkley* Court cited *Hannula v. Hacienda Homes, Inc.*, 34 Cal.2d 442, 211 P.2d 302, 304–05 (1949), for its holding that "*approval* or *disapproval* would have to be reasonable and performed in good faith." 212 Md. at 134, 128 A.2d 430 (emphasis added.) [16]

■ We note, however, that public policy and the rules of construction with respect to restrictive covenants do not

---

control of the master association which were leased by the master association. Amenity reservations have been the subject of much controversy in Florida. Our cases do not reflect that it is a matter of controversy in this state.

**15.** This contrasts with the "beyond a reasonable doubt standard" mentioned in *Meredith v. Danzer*, 142 Md. 573, 121 A. 245 (1923).

**16.** All of the prior Maryland cases we have reviewed concerned appeals arising from the disapproval of building plans. We have located no Maryland cases that concerned objections to the approval of plans; nor have the parties directed our attention to any such Maryland cases. While *Kirkley* was also concerned about plans that were disapproved, it made a reference to the standards for *approval* of building plans.

require that disapprovals and approvals should necessarily be treated equally. The strict construction rule has not been entirely abandoned; the reasonableness standard has simply been attached as an appendage. As we see it, the disapproval of a building plan might be a restraint on the free use of land and can adversely affect its alienability. The reasons for disapproval, therefore, should be very closely scrutinized. On the other hand, approval of building plans do not interfere with the unrestricted use of property nor with the "freedom of the property." Accordingly, it would appear that when a term such as "Exclusive Home-sites" in the case *sub judice* is not further defined in terms of size, cost, structure, square footage, exteriors, etc., the approving authority might well be able to give a liberal interpretation of the term's meaning when approving plans and a less liberal construction in the case of the disapproval of plans. *See Carroll County Dev. Corp. v. Buckworth,* 234 Md. 547, 552–53, 200 A.2d 145 (1964). This is especially so when, as in the case *sub judice,* the declaration reserves to the declarant the power to amend, modify or change the provisions of the declaration.

*Harbor View Improvement, supra,* involved, in part, a restriction that originally limited the subdivision to residential uses and contained a requirement that building plans had to be submitted for approval. The developers also reserved the right to "at any time to annul, waive, change, or modify any of the restrictions, conditions, covenants, agreements or provisions ... as to any part of said tract then owned by the developer...." 270 Md. at 368, 311 A.2d 422. Thereafter, the restrictions as to the subject lots were modified to permit commercial use. Lot owners submitted plans to the Board of Directors of the Association which then rejected the plans. The reasons for that rejection related primarily to the effect a duplex would have on the other homes and the fact that it was a speculation home. The trial court found that the denial by the Association had been without legal justification and ordered that it approve the project. *Id.* at 370–71, 311 A.2d 422. The

Court of Appeals, affirming, reiterated its general holdings that doubts should be resolved in favor of the unrestricted use of property. *Id.* at 372, 311 A.2d 422. The Court, however, noted its holding in *Buckworth* that disapprovals must be reasonable and exercised in good faith. *Id.* See *Lindner v. Woytowitz*, 37 Md.App. 652, 659–60, 378 A.2d 212 (1977), where we said when approval is reserved by a developer, the approving authority "would ... be required to approve or disapprove in accordance with the principles enunciated in ... *Harbor View Improvement....*"

We upheld the disapproval of resubdivision plans in *Souza v. Columbia Park and Recreation Association, Inc.*, 70 Md.App. 655, 522 A.2d 1376 (1987), where the criteria for approving resubdivision were not specifically set forth. The provisions provided that no lot could be subdivided without the prior written approval of the architectural committee. We stated, "Although the covenant at issue in *Kirkley* required approval to build or alter a building, we see no reason why we should not apply its rationale to the case *sub judice....*" 70 Md.App. at 659, 522 A.2d 1376. The rationale to which we referred was that approval requirements are valid even absent specific standards so long as "any *refusal* to approve ... [was] based upon a reason that bears some relation to the other buildings or the general plan of development; and this refusal would have to be a reasonable determination made in good faith...." *Kirkley*, 212 Md. at 133, 128 A.2d 430 (emphasis added).

Other states are generally in accord with the Maryland cases. *See Aller v. Berkeley Hall School Foundation*, 40 Cal.App.2d 31, 103 P.2d 1052, 1055 (1940) ("Reasonable building restrictions ... with respect to the ... cost of construction ... in accordance with a general plan affecting entire tracts ... are uniformly upheld as valid.") (citations omitted); *Hayes v. Gibbs*, 110 Utah 54, 169 P.2d 781, 784 (1946) ("When the title record shows a restriction against erection of houses for a contract price less than a stated sum, it is sufficient....") (citations omitted).

### D. Resolution of Issue I

We are concerned here primarily with the application of the rules of construction used in interpreting covenants. The developer reserved to itself the power to approve all building plans for any structure that was to be constructed on the lots in the subdivision. Additionally, the declaration contained a provision that the declaration could be "amended or terminated by and only by an instrument or plat[s] ... executed by Owners of at least two-thirds of the Lots...." It appears that at the time the controversy arose, the declarant still owned two-thirds of the lots, though this is not entirely clear. The declaration also specifically provided that "[t]he Declarant shall not be liable to any Owner for any damage, loss or prejudice suffered or claimed on account of (i) the *approval* or disapproval of any Plans ... (iii) the development of any land within the Property."

Our concern is limited to what is meant by the "architectural control," *i.e.*, the plan approval provisions of the covenants. The provision first requires plans to be submitted to the "declarant" (at the time of controversy the developer). The provision states that the declarant may disapprove any plans "whenever, in its opinion, any of the following circumstances exist." We are interested here only with these:

(a) Such Plans ... are not in accordance with the provisions of this Declaration, or of the Rules and Regulations and statement of policy;[17]

(c) Any Structure ... is incompatible with any Structure on ... any Lot, due to the former's ... bulk ... or relative cost;

(f) Any other set of circumstances which, in the reasonable judgment of the Declarant, would render any Structure ... inharmonious with the general development of the Property.

---

17. The covenants state in section 7.2.2 that the "Rules and Regulations ... and ... [the] statement of policy may be amended or revoked by the Declarant at any time."

As we have heretofore stated, the declaration's statement of policy is that the restrictions were adopted to "protect[ ] the value and desirability of the Property and the Lots...." Appellants argue that this requirement mandates that plans be disapproved unless the structure will cost at least $160,-000 or be at least 1,800 square feet. Stated somewhat differently, one or more of the affiants contend that the above language required the declarant to disapprove homes that were not up to the standards of the homes already erected regardless of the size and costs of the existing houses.

While we believe that the Court of Appeals has adopted, at least inferentially, the reasonableness rule, and we hold today that the general strict construction rule is modified in Maryland by the reasonableness or modern rule, that does not end the controversy. Were we faced with attempts by the declarant to modify the restrictions to permit and/or approve plans for a trailer park, a motel or hotel, or a commercial use, the reasonableness rule might require us to reverse the trial judge. We are, however, in the case *sub judice* concerned not with the protection of the value of the property but how much protection those values are entitled to under the restrictions.

Had those restrictions specified a minimum size or cost, the extent of protection contemplated would have been clear and enforceable. Under the circumstances of this case, however, the declaration reserved to the declarant's "opinion" the degree of protection to be offered to the development in the plan approval process. The declarant, of course, must exercise that power reasonably to effectuate the stated general purpose.

We have reviewed the facts contained in the affidavits with special consideration to the affidavits of the appellants filed with the Motion in Opposition to the respective Motions for Summary Judgment. None of these contain any evidence that would be admissible against the developer that he had any intention to impose minimum cost or size requirements, except to the extent that his use of the

advertising words "Exclusive Homesites" (or Exclusive Homes) might be considered evidence. Even then, there was no indication that the term "exclusive" was to have any specific connotation.

There were absolutely no averments made below in the affidavits, or otherwise, that the developer ever informed any of the appellants of any construction cost or house size limits in the development. There was no evidence, and it was clear from the affidavits that there could be none developed, of any specific representation as to such costs or house size that were made by or on behalf of the developer; nor could there be any representation made by others that would be binding upon the developer. Simply stated, a sign stating "Exclusive Homesites" or "Exclusive Homes" does not create minimum house size or cost requirements. Neither, as we see it, would signs erected by builder purchasers or speculative builders [18] on the lots in the subdivision advertising homes "from $160,000" qualify the restrictions in the declaration or be binding upon the developer.

Again, we note that the Rules and Regulations and the statement of policy of the declaration may be amended or revoked at any time by the declarant. While no formal amendment or revocation has been made, the amendatory provisions evidence an intent to afford to the declarant a broad power to exercise its discretion in the furtherance of

---

**18.** The Court of Appeals in *Chesapeake Estates Improvement Association, Inc. v. Foster,* 265 Md. 120, 125, 288 A.2d 329 (1972), held that the building of a sample house was prohibited when a covenant prohibited "any trade or business." *See also Quinn Homes, Inc. v. Bay City Improvement Ass'n, Inc.,* 45 Md.App. 479, 482, 413 A.2d 950 (1980) (applying the *Chesapeake* holding to "speculative" homes). Speculative homes, commonly referred to as "spec homes," are houses that are constructed on lots owned by the builder for the purpose of ultimate sale to an unknown purchaser. Contract homes are homes, the construction of which does not begin until a specific purchaser is committed to purchase the home (home and lot). Contract homes may be built on land owned by the purchaser, the builder or by others. The declaration in the case at bar prohibits non-residential uses on any of the lots. To the extent Stephen, Leigh or others might be constructing "spec" houses, our holding in *Quinn* and the Court of Appeals' holding in *Chesapeake* might well apply.

the objectives, not only of the development, but of the declarant as well. The approval of plans for homes in the $100,000 to $120,000 range might well be a reasonable exercise of discretion that could protect the existing properties from the reduction in value that could result from a failed subdivision by making the continuing development of the subdivision in a depressed market more feasible.

The trial judge opined that the developer's building plan approvals were "within the fair exercise of judgment of the declarant...." The trial judge, in so stating, found the developer/declarant had properly applied the rule of reasonableness in approving the plans. We concur. The declarant's approval of building plans of less than 1,800 square feet for structures costing less than $160,000 was a reasonable exercise of its discretion and was not a violation of the restriction or of the declarant's duties in the plan approval process.

## II.

THE TRIAL COURT DID NOT ERR IN FINDING THAT IN EXERCISING THE PLAN APPROVAL DUTIES, WOLF, MORRIS AND STEINBERG AS OFFICERS OF THE HOMEOWNERS' ASSOCIATION OWED NO FIDUCIARY DUTY TO APPELLANTS BY REASON OF THEIR POSITION WITH THE BYNUM OVERLOOK HOMEOWNERS ASSOCIATION, INC.

The declaration states that the declarant has the duty and responsibility for the approval of plans. The declarant is defined as H.M. Land Limited Partnership and those to whom H.M. Land Limited Partnership transfers the powers reserved to the declarant. At all times pertinent to the issues before us, H.M. Land Limited Partnership was the declarant. Only it had plan approval.

Appellants fail to state in their issues that the complaints filed below related to their allegations that Wolf, Morris and Steinberg breached their fiduciary duties in behalf of the Association by improperly approving plans. They stat-

ed in the original complaint and the amended complaint that the breach was evidenced by their failure to "exercise ... their architectural review powers...." In neither of the first two complaints did they inform the court of what is absolutely clear from the document itself, *i.e.*, that neither Wolf, nor Morris, nor Steinberg, as officers of the association, had any right or power to exercise architectural review of plans.

The second amended complaint properly states that architectural review is reserved to the declarant but baldly asserts that Wolf, Morris and Steinberg are breaching their fiduciary duties by not causing the declarant to exercise its plan approval function properly. As we have stated, the declarant's exercise of its plan approval function was not unreasonable. Wolf, Morris, and Steinberg could not have breached any fiduciary duty for failing to stop a reasonable exercise of powers by the declarant. Additionally, nowhere in the affidavits is there contained any sufficient factual support for the allegations made as to this issue.

We have extensively reviewed the law on the enforcement of restrictive covenants. The declarant breached no duty. Thus, Wolf, Morris, and Steinberg could not have breached any fiduciary duty in failing to stop it. We perceive no error by the trial court in its resolution of this issue.

### III.

BECAUSE THERE WERE NO DISPUTED FACTS, THE TRIAL COURT COMMITTED NO ERROR IN GRANTING SUMMARY JUDGMENT FOR APPELLEES.

In reviewing the grant of a summary judgment motion, we are concerned with whether a dispute of material fact exists. *Arnold Developer, Inc. v. Collins,* 318 Md. 259, 262, 567 A.2d 949 (1990); *Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 408, 559 A.2d 365 (1989); *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). "A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King,* 303 Md. at 111, 492 A.2d 608

(citing *Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 8, 327 A.2d 502 (1974)). The Court of Appeals has also recently stated that "the proper standard for reviewing the granting of a summary judgment motion should be whether the trial court was legally correct." *Heat & Power Corp. v. Air Products & Chemicals, Inc.*, 320 Md. 584, 592, 578 A.2d 1202 (1990) (citations omitted).

The trial court, in accordance with Maryland Rule 2–501(e), shall render summary judgment forthwith if the motion and response show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact which is sufficiently material to be tried. *See Coffey v. Derby Steel Co.*, 291 Md. 241, 247, 434 A.2d 564 (1981); *Berkey v. Delia*, 287 Md. 302, 304, 413 A.2d 170 (1980). Thus, once the moving party has provided the court with sufficient grounds for summary judgment,

> [i]t is . . . incumbent upon the other party to demonstrate that there is indeed a genuine dispute as to a material fact. He does this *by producing factual assertions, under oath,* based on the personal knowledge of the one swearing out an affidavit, giving a deposition, or answering interrogatories. "Bald, unsupported statements or conclusions of law are insufficient."

*Lowman v. Consolidated Rail Corp.*, 68 Md.App. 64, 70, 509 A.2d 1239, *cert. denied,* 307 Md. 406, 514 A.2d 24 (1986) (emphasis added) (citation and emphasis omitted). With these considerations in mind, we turn to the case *sub judice.*

There is no version of the facts, furnished by either party, disputed or not, that is sufficient to sustain the cause of action filed by appellants against the named defendants. Thus, the trial court was legally correct. We explain.

The allegation that disputed facts exist primarily centers around appellants' charges that certain parties misrepresen-

ted facts and/or conspired with others. We shall first discuss the conspiracy issue.

### A. Conspiracy Allegations

■ A civil conspiracy occurs when two or more persons agree to accomplish a wrongful act or agree to use unlawful means to accomplish a lawful act, with the acts of the conspirators resulting in damages to the plaintiff. *Alexander v. Evander,* 88 Md.App. 672, 699, 596 A.2d 687 (1991), *cert. denied,* 326 Md. 435, 605 A.2d 137 (1992) (quoting *Green v. Wash. Sub. San Comm'n,* 259 Md. 206, 221, 269 A.2d 815 (1970)). It, therefore, follows that if the means and the acts are lawful then the conspirator's motives are immaterial.

■ The Court in *Checket–Columbia Co. v. Lipman,* 201 Md. 494, 503, 94 A.2d 433 (1953), discussing a covenant not to compete, held: "It is well settled that if a covenantor associates with others in a conspiracy to violate his covenant, his conduct entitles the covenantee to recover against the conspirators any damages he has sustained resulting from the breach." *See also Western Maryland Dairy, Inc. v. Chenowith,* 180 Md. 236, 23 A.2d 660 (1942). We are unaware of any Maryland cases extending the reach of *Checket–Columbia* to an alleged conspiracy to violate restrictive covenants in a development. Neither has any party in the case at bar directed our attention to any cases so holding. While we see no reason why such an action would not lie for breach of building restriction cases if the evidence supports it, it is not appropriate here.

We have held that the exercise by the developer/declarant of its architectural review powers was proper. We agree with the trial court that no actionable misrepresentations occurred and that no action for civil conspiracy can be maintained. The trial court did not err in granting summary judgments as to that claim.

### B. Misrepresentation Allegations

■ There were no misrepresentations made by the developer. The observations made by appellants might well have caused them to conclude erroneously that the subdivision would be limited to homes of a certain size or value. To that extent, they were appellants' miscalculations. We are concerned in this case with whether an actionable misrepresentation occurred.

In *Wolin v. Zenith Homes, Inc.*, 219 Md. 242, 246, 146 A.2d 197, *cert. denied*, 361 U.S. 831, 80 S.Ct. 81, 4 L.Ed.2d 73 (1959), it was alleged, in part, that the sellers had represented to the buyers "that the house would be completed according to a plan and specifications in structurally sound condition and free of substantial defects; ... and that the dwelling was worth $22,950." The Wolins claimed that these statements were sufficiently misrepresentative to support their recision of the contract. The court held that "such ... alleged misrepresentations ... would furnish no ground for relief.... [T]he other representations as to the soundness and value of the house are normally considered in law to be 'indefinite generalities of exaggeration' which could deceive no rational person and therefore do not amount to 'misrepresentation.'" *Id.* at 247, 146 A.2d 197 (citations omitted).

The Court of Appeals stated in *Milkton v. French*, 159 Md. 126, 132, 150 A. 28 (1930), that "the use of the term 'perfectly safe' ... was so extravagant in scope and measure, and so indefinite and elusive in meaning, that the statement would fall within the category of a puff instead of a representation...." The Court went on to comment that the words were "so vague and general as to be incapable of particular application. They fail, therefore, to mount to a misrepresentation...." *Id.* at 133, 150 A. 28. The Court also opined that in order for a misrepresentation to be actionable, it must be on a material matter and it must be proven that it was relied upon by the party asserting the misrepresentation. *Id.* at 131, 150 A. 28. *See also Consumer Protection Div. v. Consumer Publishing Co.*, 304

Md. 731, 777, 501 A.2d 48 (1985); *Fegeas v. Sherrill*, 218 Md. 472, 475–76, 147 A.2d 223 (1958); *Snyder v. Herbert Greenbaum & Assocs., Inc.*, 38 Md.App. 144, 149, 380 A.2d 618 (1977).

The Court of Appeals in *Diamond v. Shriver*, 114 Md. 643, 650, 80 A. 217 (1911), said: "Where the language of the contract is uncertain and obscure *the acts and conduct* of the parties may be looked to to discover the meaning of the language used; but the parties cannot testify as to the understanding or interpretation of the contract." *See also String v. Steven Dev. Corp.*, 269 Md. 569, 576, 307 A.2d 713 (1973). *But see Patuxent Dev. Co. v. Ades of Lexington, Inc.*, 257 Md. 398, 406, 263 A.2d 584 (1970) ("the true test of what was meant is not what a party to the contract intended it to mean but what a reasonable person in the position of the parties would have thought it meant.")

In the case at bar, we are concerned initially with the meaning of the term "Exclusive Homesites" (or exclusive homes) and what limits this term places upon the power of the declarant to exercise its plan approval power. As we see it, "exclusive homesites" is a vague and uncertain term when the Declaration of Restrictions does not include minimum size, cost of construction, or similar, specific exclusions or qualifiers.

The *Random House Dictionary* 497 (Unabridged ed. 1983) includes among its definitions of exclusive: "not admitting of something *else;* incompatible.... excluding from consideration.... limited to the object or objects *designated*.... Shutting out all others.... single or sole.... disposed to resist the admission of outsiders.... carefully selected group.... excluding all except what is *specified*...." (Emphasis added.) The synonyms furnished include: "select, ... clannish, snobbish, restrictive, cliquish, ... illiberal." *Id. Black's Law Dictionary* 564 (6th ed. 1990) defines exclusive as: "Shutting out; ... vested in one person alone. Apart from all others, without the admission of others to participation."

As we consider the terminology used by the developer, *i.e.*, "Exclusive Homesites" or "Exclusive Homes," neither term can be construed to mean homes of at least $160,000 in cost and 1,800 square feet in size. Additionally, there was no admissible *probative* evidence that the developer had ever conveyed any such meaning to any of the appellants. Stephens and Leigh made no such communications. The only entity making those representations, Rylea, was not sued. Thus, when the trial court found there were no actionable misrepresentations by the party defendants, it was correct.

### C.  Deceptive Trade Practice Allegations

■ Appellants included in their complaint a count brought under the provisions of Title 13 of the Commercial Law Article of the Maryland Annotated Code (1990) (Consumer Protection Act). In that count, they allege that the defendants, through oral statements and written advertisements, represented that they would develop Bynum Overlook as an exclusive community of homes. They allege that the defendants specifically represented that the homes would be at least 1,800 square feet and cost at least $160,000. The uncontradicted evidence contained in the affidavits considered by the trial court indicated that the only entity that ever asserted that the homes would be of that specific size and cost was Rylea Homes. Rylea Homes was not named as a defendant in the original complaint; nor is it now a party to the case.

The Consumer Protection Act defines unfair or deceptive trade practices as including any:

(1) False, ... or misleading oral or written statement ... or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that:

(i) ... consumer realty [which includes by definition family use real property] ... [has any] characteristic ... which [it] do[es] not have;

\*     \*     \*     \*     \*     \*

(iv) ... consumer realty [is] of a particular standard [or] quality ... which [it is] not;

*    *    *    *    *    *

(9) ... [Any] misrepresentation ... with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any ... consumer realty....

Md.Code Ann., Com.Law § 13–301 (1990).

In the present case, the trial court's order granting summary judgment and/or dismissal of the Title 13 count as to the appellees was in order. The party allegedly committing the purported "key" act of deception was not a named defendant. We do not mean to say that the evidence would have supported such a count if Rylea Homes had been a party.

### Conclusion of the Summary Judgment Issue

A close review of the factual basis for appellants' complaint as stated in their affidavits leads us to conclude that, even if the only facts before the trial court were those properly stated in the appellants' affidavits, those facts standing alone do not state a cause of action against appellees, collectively or any of them individually. In other words, even if the appellees' factual presentations are disregarded no basis for suit exists.

Judge Motz recently stated, "A dispute as to a fact 'relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment.'" *Seaboard Surety Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 242–43, 603 A.2d 1357 (1992) (quoting *Salisbury Beauty Schools v. State Bd. of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367 (1973)) (emphasis in original). We further opined that in order for there to be disputed facts sufficient to render summary judgment inappropriate "there must be evidence on which the jury could reasonably find for the plaintiff." 91 Md.App. at 245, 603 A.2d 1357.

As we have indicated, there was a paucity of such evidence. The evidence of appellants would not support a plaintiff's verdict. Under these circumstances it makes no difference if appellants dispute the facts as stated by the opposing party. The trial court gave every favorable inference to the facts as stated by appellants and rendered judgment against them. The trial court's duty was to render a correct judgment. It did so and we affirm.

## IV

### THE TRIAL COURT'S DENIAL OF APPELLANTS' REQUEST FOR CONTINUANCE WAS PROPER

Maryland Rule 2–508(b) provides that when an action has been assigned a trial date, the trial shall not be continued on the ground that discovery has not yet been completed, except for good cause shown.

Appellants failed to properly reference in the extract the location of pertinent information in respect to the continuance issue. They initially stated that support for the assertion that they requested a continuance for discovery purposes could be found on extract page 125. This page is the trial court's order shortening time for appellants to respond to one of the summary judgment motions.

Upon our review of the extract, we have found no formal request for a continuance. The docket entries reveal no request for a continuance. Appellants, in their brief, direct the court's attention to transcript pages in the extract where they engage in exchange with the trial judge in respect to their need for additional discovery. We fail to find any specific request for a continuance there. This issue was not properly preserved for our review, but based upon our review of the argument made by counsel below, we would have affirmed the trial court had it been preserved. Md.Rule 8–131(a).

Denial of a motion for continuance, absent an abuse of discretion, is not a ground for reversal. *State v. Frazier*, 298 Md. 422, 451, 470 A.2d 1269 (1984); *Roberts v. State,*

298 Md. 261, 277, 469 A.2d 442 (1983); *Greenstein v. Meister,* 279 Md. 275, 368 A.2d 451 (1977) (continuance of only forty-eight hours upheld where new witness discovered); *Bugg v. Cecil County Comm'rs,* 261 Md. 507, 515, 276 A.2d 31 (1971); *Cruis Along Boats, Inc. v. Langley,* 255 Md. 139, 142–43, 257 A.2d 184 (1969) (trial counsel became unavailable due to extension of New Jersey trial); *McKenzie v. State,* 236 Md. 597, 601, 204 A.2d 678 (1964); *Bryant v. State,* 232 Md. 20, 21, 191 A.2d 566 (1963); *Mazer v. State,* 231 Md. 40, 46, 188 A.2d 552 (1963); *Lewis v. State,* 228 Md. 600, 603–04, 180 A.2d 839 (1962); *Hughes v. Averza,* 223 Md. 12, 18–19, 161 A.2d 671 (1960); *Wright v. State,* 70 Md.App. 616, 623, 522 A.2d 401 (1987); *Quarles v. Quarles,* 62 Md.App. 394, 401, 489 A.2d 559 (1985); *Berkson v. Berryman,* 62 Md.App. 79, 488 A.2d 504, *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985) (no continuance granted when new issue arose on day of trial); *Mitchell v. State,* 56 Md.App. 162, 178–80, 467 A.2d 522 (1983); *Lett v. State,* 51 Md.App. 668, 670–72, 445 A.2d 1050, *cert. denied,* 294 Md. 442 (1982); *Wilson v. State,* 44 Md.App. 318, 335, 408 A.2d 1058 (1979), *cert. denied,* 287 Md. 758 (1980); *Overmyer v. Lawyers Title Ins. Corp.,* 32 Md.App. 177, 186, 359 A.2d 260, *cert. denied,* 278 Md. 730 (1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977). Though we fail to see where a sufficient request for a continuance was made, if made, it was not an abuse to deny it. In affirming the trial court's handling of this matter, we are mindful: (1) that the record nowhere reflects any protective order prohibiting discovery; (2) that the record nowhere reflects any discovery matters being initiated during the entire course of this proceeding; (3) that no express request for a continuance was sufficiently made; (4) that no order denying a continuance is evident in the record, and (5) that serious prejudice to appellees might have resulted had a continuance been granted.

### Appellees' Issues

To the extent they have not been addressed in our discussion of the appellants' issues, our resolution of the above

issues makes it unnecessary to address appellees' issues further.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.